UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York, | ) Case No. 1:21-Civ.-00057 |
| | ) |
| | ) |
| PEOPLE OF THE STATE OF CALIFORNIA, by XAVIER BECERRA, Attorney General of the State of California, | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| PEOPLE OF THE STATE OF COLORADO, by PHILIP J. WEISER, Attorney General of the State of Colorado, | ) **COMPLAINT** |
| | ) |
| | ) |
| THE DISTRICT OF COLUMBIA, by KARL A. RACINE, Attorney General of the District of Columbia, | ) |
| | ) |
| | ) |
| COMMONWEALTH OF MASSACHUSETTS, by MAURA HEALEY, Attorney General of Massachusetts, | ) |
| | ) |
| | ) |
| THE STATE OF MINNESOTA, by KEITH ELLISON, Attorney General of the State of Minnesota, | ) |
| | ) |
| | ) |
| THE STATE OF NEW JERSEY, by GURBIR S. GREWAL, Attorney General of the State of New Jersey, | ) |
| | ) |
| | ) |
| THE STATE OF NORTH CAROLINA *ex rel.* JOSHUA H. STEIN, Attorney General of North Carolina, | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| – against – | ) |
| | ) |
| THE OFFICE OF THE COMPTROLLER OF THE CURRENCY and BRIAN P. BROOKS, in his official capacity as Acting Comptroller of the Currency, | ) |
| | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

## Table of Contents

Introduction ........................................................................................................... 1

I.   Parties ............................................................................................................ 6

II.  Jurisdiction and Venue ................................................................................. 8

III. Background on the OCC's Rulemaking ........................................................ 9

   A.   The States' Historic Role In Regulating Predatory Lending ...................... 9

   B.   The OCC Rushes To Issue the True Lender Rule ...................................... 14

   C.   The OCC Intends the True Lender Rule to Preempt State Law ................. 16

IV. The True Lender Rule Is Unlawful ............................................................. 21

   A.   The Statutes Relied Upon By the OCC Do Not Authorize It to
        Preempt State Laws ................................................................................... 22

   B.   The True Lender Rule Constitutes an Unreasonable Interpretation of
        Federal Law ............................................................................................... 25

   C.   The OCC Failed to Comply with Provisions of the Dodd-Frank Act
        Intended to Constrain Preemption Determinations by the OCC ............... 29

   D.   The True Lender Rule Reverses Longstanding OCC Opposition to
        Rent-a-Bank Schemes with No Reasoned Explanation .............................. 33

   E.   The OCC's Reliance on Its "Robust" Oversight Is Undermined
        By the OCC's Recent Embrace of Predatory Lenders .............................. 38

   F.   The True Lender Rule Is Not Entitled to Deference ................................. 40

V.  The States Have Standing to Challenge the True Lender Rule ..................... 41

   A.   Sovereign Interests ................................................................................... 41

      1.   New York Usury Laws ........................................................................ 42

      2.   California Rate Caps ............................................................................ 45

      3.   Colorado's Usury Laws and True Lender Litigation ............................. 48

      4.   The District's Usury Cap and Accompanying Regulations ................... 49

      5.   Massachusetts' Criminal Usury and Small-Dollar-Loan Laws ............. 50

      6.   Minnesota's Regulation of Consumer Lending and "De Facto" Lender Doctrine ..... 52

      7.   New Jersey's Usury Laws .................................................................... 54

      8.   North Carolina Usury and Small-Dollar-Loan Laws ........................... 55

   B.   Quasi-Sovereign Interests ......................................................................... 59

   C.   Fiscal Interests ......................................................................................... 61

Claims ................................................................................................................ 62

I.  Administrative Procedure Act (In Excess of Statutory Jurisdiction, Authority, or Limitations, or Short of Statutory Right) ................................................................................. 62

II.  Administrative Procedure Act (Arbitrary, Capricious, An Abuse of Discretion, or Otherwise Not In Accordance with Law) ................................................................................. 63

III.  Administrative Procedure Act (Action Taken Without Observance of Procedure Required by Law) ................................................................................................................................. 64

Prayer for Relief ........................................................................................................................ 65

Plaintiffs the People of the State of New York, by their attorney, Letitia James, Attorney General of the State of New York ("New York"), the People of the State of California, by their attorney, Xavier Becerra, Attorney General of the State of California ("California"), the People of the State of Colorado, by Philip J. Weiser, Attorney General of Colorado ("Colorado"), the District of Columbia, by Karl A. Racine, Attorney General of the District of Columbia ("District"), the Commonwealth of Massachusetts, by Maura Healey, Attorney General of the State of Massachusetts ("Massachusetts"), the State of Minnesota, by and through its Attorney General Keith Ellison ("Minnesota"), the State of New Jersey, by and through its Attorney General Gurbir S. Grewal ("New Jersey"), the State of North Carolina through Joshua H. Stein, Attorney General of North Carolina ("North Carolina") (collectively, the "States"), respectfully allege, upon information and belief, as follows:

**Introduction**

1.      This case involves an unlawful attempt by the Office of the Comptroller of the Currency ("OCC") to facilitate predatory lending by depriving the States of one of the most effective methods of deterring such conduct – state usury and usury-evasion laws.

2.      Since the founding era, most states have protected their residents from predatory lenders by enacting and enforcing laws that prohibit charging interest on loans at rates the states deem exploitative.  As of February 2020, 45 states have some form of usury law.[1]  State usury laws reflect a considered judgment that charging interest above certain rates exploits vulnerable

---

[1] *See* Nat'l Consumer Law Ctr., *State Rate Caps for $500 and $2,000 Loans*, Feb. 2020, *available at* https://www.nclc.org/images/pdf/high_cost_small_loans/payday_loans/FactSheet-StateRateCap.pdf.  Unless otherwise noted, all websites cited herein were last visited on January 5, 2021.

people and injures the public fisc.  Indeed, in many states, usury laws are considered

fundamental public policies of the state.[2]

3.  State usury laws enjoy broad and bipartisan support.  Most recently, 82.8% of

Nebraska voters approved a ballot measure to cap interest on payday loans at 36%.[3]  In 2016,

76% of South Dakota voters approved a similar measure – an outcome the payday loan industry

characterized as a "landslide."[4]

4.  As long as usury laws have existed, unscrupulous lenders have sought to evade

them.  States have countered these evasions by looking at the substance of any transaction

alleged to be usurious, not merely the form devised by the lender.  As Chief Justice Marshall

explained in an 1835 case involving a statute capping interest at 6%:

> The ingenuity of lenders has devised many contrivances, by
> which, under forms sanctioned by law, the [usury] statute may
> be evaded. . . . Yet it is apparent, that if giving this form to the
> contract will afford a cover which conceals it from judicial
> investigation, the [usury] statute would become a dead letter.
> Courts, therefore, preceived [sic] the necessity of disregarding
> the form, and examining into the real nature of the transaction.
> If that be in fact a loan, no shift or device will protect it.[5]

5.  Because of the extensive oversight of national banks and federal savings

associations ("National Banks") by the OCC, the National Bank Act shields National Banks from

compliance with the usury laws of 50 different states and the District of Columbia.  Under the

---

[2] *See, e.g., Madden v. Midland Funding, LLC*, 237 F. Supp. 3d 130, 150 (S.D.N.Y. 2017) (gathering cases for the proposition that "New York's usury prohibition constitutes a fundamental public policy").

[3] *See* Neb. Sec'y of State, *Initiative Measure 428*, https://electionresults.nebraska.gov/resultsSW.aspx?text=Race&type=PA&map=CTY.

[4] *See* Bart Pfankuch, *Payday Loans Gone, But Need for Quick Cash Remains*, Capital Journal (Pierre, S.D.), Mar. 23, 2018.

[5] *Scott v. Lloyd*, 34 U.S. 418, 446-47 (1835).

National Bank Act, National Banks need only comply with the interest-rate caps of the state in which they are located, regardless of where else they do business.

6.     Non-bank lenders have gone to great lengths to avoid state usury laws, including in particular, by nominally "partnering" with National Banks located in states with no interest-rate laws to avoid state usury limits nationwide.  These sham rent-a-bank schemes have been closely scrutinized by courts and regulators to determine whether the National Bank is the true lender of the resulting loans.  Thus, courts look to the substance, rather than form, of such agreements, and examine the totality of the circumstances surrounding the loans.

7.     In its modern form, Justice Marshall's "examin[ation] into the real nature of the transaction" entails courts conducting factual inquiries to determine which party has the predominant economic interest in a loan, or which party is the "true lender."

8.     Against this backdrop, the OCC has issued an unprecedented and ill-conceived rule (the "True Lender Rule" or the "Rule") that establishes a formalistic two-pronged standard by which to determine the true lender of a loan.  Under this Rule, regardless of the roles of the National Bank and the non-bank lender, the National Bank will be viewed as the "true lender" "when, as of the date of origination, it (1) is named as lender in the loan agreement or (2) funds the loan." [6]

9.     The OCC claims that the True Lender Rule is intended to address supposed "ambiguity" in provisions of three federal banking statutes that generally authorize National Banks to make loans, but, according to the OCC, do not "specifically address which entity makes

_____

[6] OCC, *National Banks and Federal Savings Associations as Lenders*, 85 Fed. Reg. 68,742, 68,742 (Oct. 30, 2020) (to be codified at 12 C.F.R. § 7.1031).

a loan when the loan is originated as part of a lending relationship involving a bank and a third party."

10.　　However, there is no ambiguity in the federal laws that justifies the OCC's adoption of the True Lender Rule.

11.　　Indeed, in adopting the True Lender Rule, the OCC exceeded its statutory authority by offering an unreasonable interpretation of federal law, and acted in a manner contrary to centuries of case law, the OCC's own prior interpretation of the law, and the plain statutory language of the federal statutes it purports to interpret.

12.　　Moreover, the True Lender Rule is contrary to Congressional actions to rein in the OCC's ability to preempt state consumer protection laws.　In particular, the Rule seeks to preempt state usury law, infringe on the States' historical police powers and facilitate predatory lending by purporting to halt the ability of the States and courts to apply well-established principles for determining whether a National Bank actually fulfills the role of lender when loans are offered through a purported partnership between a National Bank and a non-bank..

13.　　The OCC asserts that these "partnership" arrangements benefit the U.S. economy and American consumers in several ways, including expanding the availability of affordable credit to the unbanked and underbanked.　But history has demonstrated that the non-bank lenders that will benefit from the True Lender Rule have little interest in making *affordable* loans, because it is far more profitable to make high-interest-rate loans to consumers who struggle to repay and that often end in default.[7]　Instead of complete repayment, predatory lenders recoup

---

[7] *See* Christopher K. Odinet, *Predatory Fintech and the Politics of Banking*, Iowa L. Rev. 11-12, 25-26 (forthcoming 2021), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3677283.

their outlays through high, often triple-digit, interest rate charges.  The ill-conceived Rule fails to take this reality into account.

14.     The plaintiff States have every right to prohibit exploitative interest rates, even if other states decline to place limits on interest rates.  These differences are at the core of federalism, as Judge Easterbrook has explained:  "the Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity."[8]  Far from cherishing or even respecting local differences, the OCC would strip the plaintiff States of the ability to enforce their own laws.

15.     Perhaps as objectionable as the substance of the True Lender Rule are the circumstances under which it was issued.  The OCC issued the final True Lender Rule on October 27, 2020,[9] a date that is significant for two reasons.  First, it was less than two months after the OCC received *four thousand* comments on its initial proposal, many of which raised substantive objections to the proposal.[10]  Second, it was one week before a presidential election that had the potential to – and ultimately did – usher in a new administration with potentially different policies regarding predatory lending.

16.     As explained in detail below, the OCC has no authority to unilaterally rewrite federal and constitutional law, undermining long-standing policy positions of the OCC itself in the process, and the Court should hold unlawful and set aside the True Lender Rule.

---

[8] *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 412 (7th Cir. 2015).

[9] *See* Press Release, OCC, O*ffice of the Comptroller of the Currency Issues True Lender Rule*, Oct. 27, 2020, *available at* https://www.occ.gov/news-issuances/news-releases/2020/nr-occ-2020-139.html.  The True Lender Rule was published in the Federal Register on October 30, 2020.

[10] *See* True Lender Rule, 85 Fed. Reg. at 68,742.

## I.  <u>Parties</u>

17.     Plaintiff the State of New York is a sovereign state of the United States of America.  New York is represented by Attorney General Letitia James, New York's chief law-enforcement officer.[11]  As a body politic and a sovereign entity, New York brings this action on behalf of itself and as trustee, guardian, and representative of all residents and citizens of New York.

18.     Plaintiff the People of the State of California bring this action by and through their Attorney General, Xavier Becerra, California's chief law officer.[12]

19.     Plaintiff the State of Colorado is a sovereign state of the United States of America.  Colorado is represented by Attorney General Phillip Weiser, Colorado's chief law-enforcement officer.  As a body politic and a sovereign entity, Colorado brings this action on behalf of itself and as trustee, guardian, and representative of all residents and citizens of Colorado.

20.     Plaintiff the District of Columbia is a municipal corporation empowered to sue and be sued, and is the local government for the territory constituting the permanent seat of the federal government.  The District brings this case through the Attorney General for the District of Columbia, who is the chief legal officer for the District and possesses all powers afforded the Attorney General by the common and statutory law of the District.  The Attorney General is responsible for upholding the public interest and has the authority to file civil actions in order to

---

[11] N.Y. Executive Law § 63.

[12] Cal. Const. art. V, § 13.

protect the public interest.[13]  The District brings this action on behalf of itself and as trustee, guardian, and representative of all residents and citizens of the District of Columbia.

21.     Plaintiff the Commonwealth of Massachusetts, represented by and through Attorney General Maura Healey, is a sovereign state of the United States of America. Attorney General Healey is the Commonwealth's chief law-enforcement officer and brings this challenge pursuant to her independent constitutional, statutory, and common-law authority.

22.     Plaintiff the State of Minnesota brings this action by and through its Attorney General Keith Ellison.  Attorney General Ellison is the chief law officer of Minnesota and, pursuant to common law and statutory authority, may institute and maintain all such actions and proceedings as necessary for the enforcement of Minnesota's laws, the preservation of order, and the protection of Minnesota's legal and sovereign rights.[14]

23.     Plaintiff the State of New Jersey is a sovereign state of the United States of America.  This action is brought on behalf of New Jersey by Attorney General Gurbir S. Grewal, New Jersey's chief legal officer.[15]

24.     Plaintiff the State of North Carolina, represented by and through Attorney General Joshua H. Stein, is a sovereign state of the United States of America.  Attorney General Stein is the State of North Carolina's chief law-enforcement officer and brings this challenge pursuant to his independent constitutional, statutory, and common-law authority.

---

[13] D.C. Code § 1-301.81.

[14] *Head v. Special Sch. Dist. No. 1*, 182 N.W.2d 887, 892 (Minn. 1970); Minn. Stat. ch. 8.

[15] N.J. Stat. Ann. § 52:17A-4(e), (g).

25.     Defendant the Office of the Comptroller of the Currency is an executive agency of the United States government.  The OCC's principal address is 400 7th Street SW, Washington, D.C., 20219.

26.     Defendant Brian P. Brooks is the Acting Comptroller of the Currency and is being sued in his official capacity.  His official address is 400 7th Street SW, Washington, D.C., 20219.

27.     Defendant Brooks became Acting Comptroller on May 29, 2020 when Comptroller Joseph Otting resigned.

28.     On November 27, 2020, President Trump nominated defendant Brooks to a five-year term as Comptroller.[16]

## II.     **Jurisdiction and Venue**

29.     The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 2201(a).

30.     This action is brought under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*  The True Lender Rule became effective on December 29, 2020 and is a final agency action reviewable under 5 U.S.C. § 704.

31.     Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because Plaintiff New York resides in this district.

---

[16] *See* Nominations & Appointments, White House, *One Nomination Sent to the Senate*, Nov. 27, 2020, *available at* https://www.whitehouse.gov/presidential-actions/one-nomination-sent-senate-112720/.

## III.  Background on the OCC's Rulemaking

### A.  The States' Historic Role In Regulating Predatory Lending

32.  The States and the federal government have long shared responsibility for regulating lenders and protecting consumers from predatory practices.  A key feature of this balance of powers between state and federal governments is the "dual banking system" originating from the National Bank Act of 1864 ("NBA").[17]  Under this framework, the OCC maintains supervisory authority over National Banks, and the NBA regulates the interest rate that such banks may charge in interstate transactions.[18]

33.  When National Banks originate loans, they are permitted to charge the maximum interest rate permissible in the state in which they are located, to "export" that interest rate to borrowers in other states, and to preempt any state usury laws if the interest rate on the loan exceeds the amount permitted by state law, including state law in the state where the borrower resides.[19]  The interplay between NBA provisions regarding interest rates and state usury laws is variously described as interest-rate exportation or NBA preemption, both of which refer to the same legal issues.

34.  The NBA does not apply to non-bank entities, however.[20]  Rather, such lenders are generally subject to oversight by state licensing authorities and must comply with state

---

[17] *See* Jay B. Sykes, Cong. Research Serv., R45081, *Banking Law: An Overview of Federal Preemption in the Dual Banking System* 4 (2018).

[18] 12 U.S.C. §§ 85, 481.  The OCC has the same powers with respect to Federal savings associations under the Home Owners' Loan Act.  *See* 12 U.S.C. § 1463.

[19] *See Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 10-11 (2003).  Unless otherwise indicated, all citations in this Complaint will omit internal quotation marks and citations.

[20] 12 U.S.C. § 25b(h)(2) ("No provision of this title [*i.e.*, the NBA] . . . shall be construed as preempting, annulling, or affecting the applicability of State law to any subsidiary, affiliate, or agent of a national bank (other than a subsidiary, affiliate, or agent that is chartered as a national bank)."); 12 U.S.C. § 1 (providing for OCC authority to "the institutions and other persons

consumer-lending statutes designed to protect the consuming public, as the OCC

acknowledges.[21]

35.    These statutes provide bedrock protections that serve important state interests,

safeguard borrowers from abuses in the marketplace, and protect the economy from financial

crises brought on by unsustainable debt levels.[22]  State usury laws, for example, have long

prevented non-banks from charging excessive and exploitative interest rates against vulnerable

consumers.  Lender-licensing laws prevent loan-sharking and ensure that non-banks engaged in

the business of lending conduct their business in an ethical, legally compliant, and financially

sound manner.  With consumer debt at record levels, it is more important than ever for states to

exercise their sovereign power to regulate and protect residents from harmful lending practices

by non-banks.

36.    Financial products and consumer lending have also become increasingly complex

in recent years, which has led to a number of different schemes and maneuvers to avoid

compliance with state consumer protections.  "Rent-a-bank" schemes are one example.

37.    Although some National Banks attempt to pass on the benefits of NBA

preemption to their non-bank partners, the NBA shields National Banks – and only National

Banks – from liability under state usury laws.  In rent-a-bank scenarios, non-bank lenders

---

subject to its jurisdiction" – *i.e.*, national banks, federal savings associations, and other financial institutions that it regulates).

[21] *See* True Lender Rule, 85 Fed. Reg. at 68,743 ("As noted in the proposal, if a nonbank partner is the true lender, the relevant state (and not OCC) would regulate the lending activity, and the OCC would assess the bank's third-party risk management in connection with the relationship itself.").

[22] *See, e.g.,* N.C. Gen. Stat. § 24-2.1(g) ("It is the paramount public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws.").

looking to charge exorbitant interest rates and seeking to avoid state interest-rate caps enter into relationships with National Banks and then placing the name of a National Bank on the loan documents as the loan originator.  In doing so, non-banks use National Banks as the "delivery vehicle"[23] to charge interest at rates the non-banks could not charge on their own.[24]  The non-bank lender provides the underwriting, marketing, and funding of the loans, often formally purchasing the note immediately after origination.  The National Bank is then paid a fee to play the role of originator in name only, bearing little, if any, risk in the loan's performance.

38.     State consumer-lending statutes, however, do not countenance such evasion and have been repeatedly enforced against non-banks engaging in such conduct.  Disguised lending by non-banks may be prevented by state law specifically applying consumer-lending laws to non-banks that act as the "true" or "de facto" lender.[25]  As one court has explained, "[i]f the true lender is a non-bank," then the preemption rights available under federal banking law "cannot attach."[26]

39.     The "true lender" doctrine is an outgrowth of longstanding decisional case law recognizing the application of state statutes to non-banks engaged in lending, regardless of the

---

[23] OCC Preemption Determination 01-10, 66 Fed. Reg. 28,593, 28,595 n.6 (May 23, 2001).

[24] One court characterized rent-a-bank schemes as attempts by non-banks to "borrow" NBA preemption from National Banks.  *See Kaur v. World Bus. Lenders, LLC*, 440 F. Supp. 3d 111, 119 (D. Mass. 2020).

[25] *See, e.g.*, Ga. Code. Ann. § 16-17-2(b)(4) (creating totality of the circumstances test to determine when "a purported agent shall be considered a de facto lender" for purposes of state usury laws); *Easter v. Am. W. Fin.*, 381 F.3d 948, 957 (9th Cir. 2004) (applying the de facto lender doctrine under Washington state law).

[26] *See In re Rent-Rite SuperKegs W. Ltd.*, --- B.R. ----, Case No. 19-CV-01552-RBJ, 2020 WL 6689166, at *6 (D. Colo. Aug. 12, 2020).

use of labels and form.  As just one variation of an age-old maxim, the New York Court of

Appeals stated in 1875:

> The [loan] transaction must be judged by its real character,
> rather than by the form and color which the parties have seen
> fit to give it. The shifts and devices of usurers to evade the
> statutes against usury, have taken every shape and form that the
> wit of man could devise, but none have been allowed to
> prevail.  Courts have been astute in getting at the true intent of
> the parties, and giving effect to the statute.[27]

40.     Indeed, nearly every jurisdiction recognizes this concept in the interpretation and

application of state consumer-lending statutes.[28]

---

[27] *Quackenbos v. Sayer*, 62 N.Y. 344, 346 (1875).

[28] *See, e.g., Scott*, 34 U.S. at 419 ("The ingenuity of lenders has devised many
contrivances by which, under forms sanctioned by law, the statute may be evaded. . . . Yet it is
apparent, that if giving this form to the contract will afford a cover which conceals it from
judicial investigation, the statute would become a dead letter. Courts, therefore, perceived the
necessity of disregarding the form, and examining into the real nature of the transaction.  If that
be in fact a loan, no shift or device will protect it."); *Easter*, 381 F.3d at 957 (recognizing that
"Washington courts consistently look to the substance, not the form, of an allegedly usurious
action"); *BankWest, Inc. v. Oxendine*, 598 S.E.2d 343, 348 (Ga. Ct. App. 2004) ("To determine if
a contract is usurious, we critically examine the substance of the transaction, regardless of the
name given it . . . The law intends that a search for usury shall penetrate to the substance."); *W.
Auto Supply Co. v Vick*, 277 S.E.2d 360, 366 (N.C. 1981) ("The courts of this state regard the
substance of a transaction, rather than its form as controlling.  Specifically, when there is an
allegation that the usury laws have been violated by a particular act or course of conduct, the
courts of North Carolina will not hesitate to look beneath the formality of the activity to
determine whether such an incident is, in fact, usurious."); *Carter v. Brand*, 1 N.C. 255, 257
(1800) ("Every case arising upon the Act of Assembly to restrain excessive usury must be
viewed in all its circumstances, so as to ascertain the real intention of the parties.  If that be
corrupt in the substance and design, no pretext however plausible, no contrivance however
specious, no coloring however artful, with which the transaction is veiled, will secure it from the
censure of the law."); *Crim v. Post*, 23 S.E. 613, 614 (W. Va. 1895) ("The usury statute
contemplates that a search for usury shall not stop at the mere form of the bargains and contracts
relative to such loan, but that all shifts and devices intended to cover a usurious loan or
forbearance shall be pushed aside, and the transaction shall be dealt with as usurious if it be such
in fact."); *Rosenbusch v. Fry*, 5 N.J. Misc. 312, 313 (Dist. Ct. 1927) ("The substitution of some
form or device which is supposed to give the semblance of a purchase, in the endeavor to cover
up a usurious loan, is familiar to all.  The law, however, regards the essential nature of the
transaction, not the incidents created to give it a fictitious color.").

41.     Applying this basic concept of state law, numerous courts across the United States have held that non-banks cannot escape usury prohibitions and licensing oversight under the guise of rent-a-bank schemes.[29]  Courts have not hesitated to apply the true lender doctrine even when a National Bank is a nominal party to the transaction.[30]

42.     In applying the doctrine, courts carefully scrutinize transactions to see which party – *i.e.*, the National Bank or the non-bank – is the "true lender" of the loan.  They typically look to see which party had the predominant economic interest in the loan, considering factors such as which party held the financial risk, and they may also consider other indicia of the parties' intent to create a transaction where form attempts to trump substance.[31]

---

[29] *See, e.g.*, *Cmty. State Bank v. Strong*, 651 F.3d 1241, 1260 (11th Cir. 2011) (concluding that federal banking law does not immunize bank from state usury law "if it is not the true lender of the loan"); *Pennsylvania v. Think Fin., Inc.*, Case No. 14-cv-7139, 2016 WL 183289, at *13 (same); *Spitzer v. Cnty. Bank of Rehoboth Beach,* 45 A.D.3d 1136, 1138 (3d Dep't 2007) (holding that "the true lender," rather than "the written characterization that the parties seek to give" the transaction, determines whether a bank or a non-bank would be treated as the lender); *cf. CashCall, Inc. v. Morrisey*, Case No. 12-cv-1274, 2014 WL 2404300, *7, 14-15 (W. Va. 2014) (affirming judgment finding that unlicensed entity "was the de facto or true lender" and thus violated state licensing and usury laws).

[30] *See Daniel v. First Nat'l Bank of Birmingham*, 227 F.2d 353, 357 (5th Cir. 1955) (holding a National Bank was liable for usury because the transaction involved "a loan or extension of credit to which the Bank was privy throughout" even though the contract was assigned to the bank after the transaction closed); *Ubaldi v. SLM Corp*., 852 F. Supp. 2d 1190, 1203 (N.D. Cal. 2012) (denying motion to dismiss in case alleging that Sallie Mae, not a National Bank, was the true lender); *Goleta Nat'l Bank v. O'Donnell*, 239 F. Supp. 2d 745, 747, 755 (S.D. Ohio 2002) (concluding that if a non-bank was the "true lender," then it would "unquestionably [be] subject to" state usury law, even though a different entity "is clearly listed as the lender on the loan documents"); *Goleta Nat'l Bank v. Lingerfelt*, 211 F. Supp. 2d 711, 717-18 (E.D.N.C. 2002) (same); *Salazar v. Ace Cash Exp., Inc*., 188 F. Supp. 2d 1282, 1285 (D. Colo. 2002) (same); *Eul v. Transworld Sys*., No. 15 C 7755, 2017 WL 1178537, at *6 (N.D. Ill. Mar. 30, 2017) ("Because Plaintiffs allege that [a National Bank] was not the true originator of their loans, the Court is not persuaded that NBA preemption applies here.").

[31] *See, e.g., Kaur*, 440 F. Supp. 3d at 122 ("In determining the true lender, courts have looked to which institution had the predominant economic interest, for which the key and most determinative factor is which entity placed its own money at risk at any time during the transactions."); *Bank of Rehoboth Beach,* 45 A.D.3d at 1138 ("[A]n examination of the totality of

43. The True Lender Rule attempts to halt this careful and necessary scrutiny, to the detriment of consumers.

**B.  The OCC Rushes To Issue the True Lender Rule**

44. On July 22, 2020 the OCC published a notice of proposed rulemaking regarding a true lender proposal substantially similar to the final True Lender Rule.[32]  The comment period closed on September 3, 2020.[33]  The OCC received approximately 4,000 comments on the proposed rule, the vast majority of which opposed the rule,[34] including comments from the Center for Responsible Lending,[35] National Association of Consumer Credit Administrators,[36] the Conference of State Bank Supervisors,[37] and 24 State Attorneys General.[38]  The OCC

---

the circumstances surrounding this type of business association must be used to determine who is the true lender, with the key factor being who had the predominant economic interest in the transactions."); *Minnesota v. Cashcall, Inc*., Case No. 27-CV-13-12740, 2013 WL 6978561, at *4 (Minn. Dist. Ct. Sep. 6, 2013) (denying dismissal where state sued for violations of state law by "de facto" lender and where "the loans are inextricably linked to the Defendants' funding mechanism and operational support"), *aff'd*, 2014 WL 4056028 (Minn. Ct. App. Aug. 18, 2014) (unpublished).

[32] *See* OCC, *National Banks and Federal Savings Associations as Lenders*, 85 Fed. Reg. 44,223 (proposed July 22, 2020) (to be codified at 12 C.F.R. § 7.1031).

[33] *See id.*

[34] *See* True Lender Rule, 85 Fed. Reg. at 68,742 ("The OCC received approximately 4,000 comments on the proposal, the vast majority of which were from individuals using a version of one of three short form letters to express opposition to the proposal.").

[35] Center for Responsible Lending *et al*., Comment Letter on True Lender Rule (Sept. 3, 2020), https://www.regulations.gov/document?D=OCC-2020-0026-0238 ("CRL Comment").

[36] Consumer Credit Administrators, Comment Letter on True Lender Rule (Sept. 3, 2020), https://www.regulations.gov/document?D=OCC-2020-0026-0184.

[37] Conference of State Bank Supervisors, Comment Letter on True Lender Rule (Sept. 3, 2020), https://www.regulations.gov/document?D=OCC-2020-0026-0203 ("State Bank Supervisors Comment").

[38] Attorney General of the State of New York *et al.*, Comment Letter on True Lender Rule (Sept. 3, 2020), https://www.regulations.gov/document?D=OCC-2020-0026-0233 ("Attorneys General Comment").

released the final True Lender Rule on October 27, 2020, less than two months after receiving a record number of comments.[39]

45.     The final True Lender Rule adopted only one substantive change from the proposed rule despite the comments.[40]

46.     Under the True Lender Rule, regardless of the role of the non-bank lender, a National Bank will be deemed the "true lender" of any loan "when, as of the date of origination, it (1) is named as lender in the loan agreement or (2) funds the loan."[41]  The True Lender Rule also makes clear that, when one National Bank is identified as the lender in the loan agreement and another National Bank funds the loan, the former will be deemed to have "made the loan."[42]

47.     The OCC is clear that the True Lender Regulation is an interpretation of only 12 U.S.C. §§ 24, 371, and 1464(c).[43]  Despite the fact that the text of the regulation itself also

---

[39] *See* Jeremy T. Rosenblum & Mindy Harris, *Hundreds Comment on OCC Proposed "True Lender" Rule*, Consumer Finance Monitor, Oct. 13, 2020, https://www.consumerfinancemonitor.com/2020/10/13/hundreds-comment-on-occ-proposed-true-lender-rule/ (noting that the OCC had received only 63 comments on a recent rulemaking).

[40] *See* True Lender Rule, 85 Fed. Reg. at 68,745 ("[W]e have amended the regulatory text to provide that where one bank is named as the lender in the loan agreement and another bank funds the loan, the bank named as the lender in the loan agreement makes the loan. . . . Otherwise, the OCC adopts the regulatory text as proposed.").

[41] 12 C.F.R. § 7.1031(b).

[42] 12 C.F.R. § 7.1031(c).

[43] *See* True Lender Rule, 85 Fed. Reg. at 68,743.

explicitly states that it is applicable to 12 U.S.C. §§ 85 and 1463(g),[44] the OCC states that the True Lender Rule does not rely upon, and is not an interpretation of, those two statutes.[45]

48.     While the OCC pays lip service to condemning predatory lending, it gives its wholesale endorsement to lending relationships predicated on evasion of usury laws designed to protect consumers.  Without citation to any evidence or authority, the OCC opines that "lending partnerships" between National Banks and non-bank entities play a "critical role in our financial system" because these partnerships allegedly "expand access to credit and provide an avenue for banks to remain competitive as the financial sector evolves."[46]  The OCC further speculates that through such partnerships "banks often leverage technology developed by innovative third parties that helps to reach a wider array of customers."[47]

## C.     The OCC Intends the True Lender Rule to Preempt State Law

49.     The OCC intends that when the True Lender Rule deems a National Bank to be the "true lender" of a loan, federal law will govern the loan to the extent it conflicts with otherwise applicable state law.[48]  The OCC explains that the True Lender Rule and another rule

---

[44] *See* 12 C.F.R. § 7.1031(b) (stating the two-pronged test applies "[f]or purposes of sections 5136 and 5197 of the Revised Statutes (12 U.S.C. 24 and 12 U.S.C. 85), section 24 of the Federal Reserve Act (12 U.S.C. 371), and sections 4(g) and 5(c) of the Home Owners' Loan Act (12 U.S.C. 1463(g) and 12 U.S.C. 1464(c)").

[45] *See* True Lender Rule, 85 Fed. Reg. at 68,743 ("Banks do not obtain their lending authority from section 85 or 12 U.S.C. 1463(g).  Nor are these statutes the authority the OCC is relying on to issue this rule."); *id*. at 68,744 (stating that "this rulemaking is not an interpretation of section 85").

[46] *Id.* at 68,742.

[47] *Id.*

[48] *See id.* (explaining that the True Lender Rule is intended to resolve "legal uncertainty" that supposedly prevents parties from "reliably determin[ing] the applicability of key laws, including the law governing the permissible interest that may be charged on the loan").

purporting to extend NBA preemption to any entity that purchases a loan from a National Bank[49] "operate together" to ensure that "[w]hen a bank makes a loan pursuant to the test established in this regulation, the bank may subsequently sell, assign, or otherwise transfer the loan without affecting the permissible interest term, which is determined by reference to state law."[50]

50.  As noted above, in determining whether a loan is usurious, courts have historically looked to the substance of the transaction, not its form, recognizing that usury has "taken every shape and form that the wit of man could devise."[51]  Courts carefully scrutinize transactions to see which party – the National Bank or the non-bank – is the "true lender" of the loan, usually looking to see which party had the predominant economic interest in the loan.  The True Lender Rule is designed to foreclose this judicial scrutiny because it has purportedly led to "divergent standards" and created "uncertainty":  "As a result of this legal uncertainty, stakeholders cannot reliably determine the applicability of key laws, including the law governing the permissible interest that may be charged on the loan."[52]

51.  Contrary to the OCC's assertion, for nearly 200 years, courts considering usury cases have consistently examined the substance of loan transactions rather than the form, which has led to a widely adopted "predominant economic interest" standard.  The True Lender Rule

---

[49] *See* OCC, *Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred*, 85 Fed. Reg. 33,530-36 (June 2, 2020) (codified at 12 C.F.R. §§ 7.40001(e) and 160.110(d)).  Several States sued the OCC to invalidate the rule, arguing, among other things, that the OCC lacked statutory authority to issue the rule.  *See California v. OCC*, Case No. 4:20-Civ.-05200-JSW (N.D. Cal.).  Another coalition of States sued the Federal Deposit Insurance Corporation ("FDIC") to invalidate a substantially similar rule.  *See California v. FDIC*, Case No. 4:20-Civ.-05860 (N.D. Cal.).  Those lawsuits are currently pending.  The True Lender Rule is invalid regardless of the outcome of those lawsuits.

[50] True Lender Rule, 85 Fed. Reg. at 68,743.

[51] *Quackenbos*, 62 N.Y. at 346.

[52] True Lender Rule, 85 Fed. Reg. at 68,742.

endeavors to supplant longstanding state statutory and case law with an artificial and unprecedented standard that eschews the economic realities of consumer loan transactions and is in direct conflict with existing law.

52.     While the True Lender Rule conspicuously avoids using the word preemption, the True Lender Rule accomplishes exactly that. It would apply three federal banking statutes in place of state consumer protections and purports to categorically invalidate the "true lender" doctrine currently applicable to state consumer-lending laws. The OCC is also clear that the very purpose of the True Lender Rule is to replace state true-lender standards employed by courts today with a bright-line federal standard.[53] As the OCC is well aware, the true lender doctrine is typically only implicated by claims premised on a violation of a state usury or other consumer-lending law,[54] and courts apply state law in determining the true lender.[55] Thus, the effect of the True Lender Rule would be the attempted wholesale preemption of longstanding state laws.[56]

---

[53] *See id.* at 68,743 ("The OCC believes that this rule provides a simple, bright-line test to determine when a bank has made a loan and, therefore, is the true lender in a lending relationship. The only required factual analysis is whether the bank is named as the lender or funds the loan. The OCC has evaluated various standards established by courts and has determined that a clear, predictable, and easily administrable test is preferable. This test will provide legal certainty, and the OCC's robust supervisory framework effectively targets predatory lending, achieving the same goal as a more complex true lender test.").

[54] This can either be direct claims under a usury statute where such suits are allowed, or indirect claims for violation of a consumer protection statute with usury as the underlying violation. For example, in *Consumer Financial Protection Bureau v. CashCall, Inc.*, the CFPB alleged the defendants had engaged in unfair, deceptive, and abusive acts and practices in violation of 12 U.S.C. § 5536 "by servicing and collecting full payment on loans that state-licensing and usury laws had rendered wholly or partially void or uncollectible." Case No. 15-CV-7522, 2016 WL 4820635, at *4 (C.D. Cal. Aug. 31, 2016).

[55] *See, e.g.*, *Easter*, 381 F.3d at 957 (applying the de facto lender doctrine under Washington state law).

[56] *See Kaur*, 440 F. Supp. 3d at 122 ("If the national bank is not the 'true lender,' some courts have ruled, the partner non-bank entity does not gain the benefit of federal preemption.");

53.     The True Lender Rule would preempt application of state usury laws to loans funded by, or naming as the lender, a National Bank, even when the National Bank holds no substantial financial interest in them.  Specifically, the True Lender Rule would extend application of 12 U.S.C. §§ 85 and 1463(g) – the federal interest-rate provisions governing loans under the True Lender Rule – to loans in which National Banks have no substantial financial interest.  The OCC claims that sections 85 and 1463(g) merely "provide a choice of law framework for determining which state's law applies."[57]  That is patently false.  Sections 85 and 1463(g) create a distinctly federal regime that sets forth several options governing the rates National Banks may charge – only one of which depends on the state law of the state where the bank is "located."  Indeed, these provisions displace state law, allowing National Banks to charge the *higher* of what a bank's "home" state permits or a federal rate set by the regional Federal Reserve Banks.[58]  Moreover, National Banks may charge the rates permitted by their "home" states notwithstanding the otherwise applicable law of the states where they do business.[59]  Sections 85 and 1463(g) are informed by state law, but their function is to displace state usury laws to set the rate of interest National Banks may charge; thus, as the Supreme Court has held, "there is no doubt that § 85 pre-empts state law."[60]  By extending the reach of sections 85 and 1463(g), the True Lender Rule seeks to preempt state consumer protection laws.

---

*Ubaldi*, 852 F. Supp. 2d at 1193-1203 (evaluating whether the state law true lender doctrine applies to a transaction involving a national bank as a question of preemption).

[57] True Lender Rule, 85 Fed. Reg. at 68,743 (discussing sections 85 and 1463(g))

[58] 12 U.S.C. §§ 85, 1463(g).

[59] *Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 310 (1978).

[60] *Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 744 (1996).

54.     In response to concerns that replacing the true lender test with a formalistic standard would unleash a wave of predatory loans, the OCC points to its purportedly "robust" oversight of National Banks.[61]  The OCC states that "[e]very bank is responsible for establishing and maintaining prudent credit underwriting practices" that, among other things, "provide for consideration, prior to credit commitment, of the borrower's overall financial condition and resources, the financial responsibility of any guarantor, the nature and value of any underlying collateral, and the borrower's character and willingness to repay as agreed."[62]

55.     The OCC is quite clear, however, that it has no oversight of non-bank lenders: "As noted in the proposal, if a nonbank partner is the true lender, the relevant state (and not OCC) would regulate the lending activity, and the OCC would assess the bank's third-party risk management in connection with the relationship itself."[63]  In many rent-a-bank arrangements National Banks avoid taking on significant economic risk from partnership loans, meaning the arrangements are unlikely to raise safety and soundness concerns that are the core mission of the OCC.  The OCC would thus have less of an incentive to police these arrangements under the True Lender Rule.

56.     But the True Lender Rule would attempt to foreclose inquiries by state regulators, private litigants, or the judiciary into many aspects of the lending relationship if a National Bank is identified as the lender in the loan agreement, or if the National Bank "funds" the loan within

---

[61] *See* True Lender Rule, 85 Fed. Reg. at 68,745-46.

[62] *Id.* at 68,746.

[63] *Id.* at 68,743; *see also id.* ("This rule making does not assert authority over nonbanks . . . .").

the meaning of the True Lender Rule.  Under the True Lender Rule's formalistic approach, these loans are subject to the NBA, and state usury laws are preempted.

## IV.  The True Lender Rule Is Unlawful

57.  The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law."[64]

58.  Agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [made a decision that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[65]  Courts must "consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."[66]  While "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change," an agency must "show that there are good reasons for the new policy," and "must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account."[67]  Where an agency failed to provide a "reasoned explanation" for its departure from prior policy, the agency action is arbitrary and capricious.[68]

---

[64] 5 U.S.C. § 706(2)(A), (C), (D).

[65] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[66] *Id.*

[67] *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016).

[68] *Id.*

## A.    The Statutes Relied Upon By the OCC Do Not Authorize It to Preempt State Laws

59.    Courts have consistently held that the rulemaking authority of federal agencies is constrained by the statutory language Congress chose to enact.  "An agency's 'power to promulgate legislative regulations is limited to the authority delegated' to it by Congress." [69] Generally, when an agency uses its power to interpret a federal statute and "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." [70]  But, "when it comes to the OCC in particular, Congress has made it abundantly clear that courts are not to give any heightened deference to the agency's views on NBA preemption."[71]

60.    The OCC conclusorily asserts that the True Lender Rule is intended to address ambiguities in the NBA, the Federal Reserve Act, and the Home Owners' Loan Act ("HOLA") that authorize National Banks to make loans, but do not "specifically address which entity makes a loan when the loan is originated as part of a lending partnership involving a bank and a third party."[72]

61.    However, the three federal laws the OCC purports to interpret are not ambiguous; they simply do not apply to the scope of lending "partnerships" the OCC seeks to endorse.

62.    The True Lender Rule purports to interpret the following three federal banking statutes:

---

[69] *Amalgamated Transit Union v. Skinner*, 894 F.2d 1362, 1368 (D.C. Cir. 1990).

[70] *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).

[71] *Hymes v. Bank of Am., N.A*, 408 F. Supp. 3d 171, 183 (E.D.N.Y. 2019).

[72] True Lender Rule, 85 Fed. Reg. at 68,742.

a) a provision of the NBA providing that a national banking association "shall have power . . . To exercise . . . all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes according to the provisions of [the NBA]" [73];

b) a provision of the Federal Reserve Act providing that "[a]ny national banking association may make, arrange, purchase or sell loans or extensions of credit secured by liens on interests in real estate . . . ." [74]; and

c) a provision of HOLA providing that "[t]o the extent specified in regulations of the Comptroller, a Federal savings association may invest in, sell, or otherwise deal in the following loans and other investments . . . ." [75]

63.     The plain language of these statutes cannot be read to authorize what the OCC is purporting to do in the True Lender Rule.  The OCC is attempting to re-write federal law to suit its policy preference that state law should be preempted when a loan is made as part of a purported partnership between a National Bank and a non-bank.

64.     Nothing in the statutes relied upon by the OCC even hints at such a possibility. The Supreme Court has reaffirmed as a "core administrative-law principle" that an administrative agency "may not rewrite clear statutory terms to suit its own sense of how the statute should operate." [76]

65.     In addressing the OCC's proposed rule, the Attorneys' General Comment alerted the OCC that the OCC "does not cite any case law – and the States are not aware of any – th[at]

---

[73] 12 U.S.C. § 24(Seventh)

[74] 12 U.S.C. § 371(a).

[75] 12 U.S.C. § 1464(c).

[76] *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

holds that the NBA, Federal Reserve Act, or HOLA is the right source of law to answer whether a National Bank is the true lender."[77] The OCC did not respond to this point but instead failed to consider this important aspect of the problem. The OCC's *ipse dixit* assertions that interpretations of 12 U.S.C. §§ 24, 371, and 1464(c) are relevant to the question of identifying the true lender do not make it so, and the APA renders unlawful a regulation depending on such assertions.[78]

66. Moreover, when addressing preemption, courts start with "the assumption that the historic police powers of the States [are] not to be superseded by [federal law] unless that was the clear and manifest purpose of Congress."[79]

67. Consumer-protection laws like interest-rate caps and the true lender doctrine, which govern the rate caps' applicability, are among those historic police powers held by the states.[80] And because the True Lender Rule applies not only to National Banks but also to non-bank entities whose activities are uniformly subject to state law, it is a new incursion into an area

---

[77] Attorneys General Comment at 11 n.51.

[78] *See Cross-Sound Ferry Servs., Inc. v. ICC*, 738 F.2d 481, 485 (D.C. Cir. 1984) ("The [agency] rests instead on ipse dixit and a broad appeal to deregulatory policies. These justifications neither jointly nor severally comport with the reasoned decisionmaking requirements of [5 U.S.C. § 706].").

[79] *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008); *see also id.* (presumption against preemption "applies with particular force when Congress has legislated in a field traditionally occupied by the States. Thus, when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily accept the reading that disfavors pre-emption.").

[80] *Griffith v. State of Conn.*, 218 U.S. 563, 569 (1910) ("It is elementary that the subject of the maximum amount to be charged by persons or corporations subject to the jurisdiction of a state for the use of money loaned within the jurisdiction of the state is one within the police power of such state.").

in which states have traditionally exercised their police powers. Thus, the strong presumption against preemption should apply to the True Lender Rule.

**B.** **The True Lender Rule Constitutes an Unreasonable Interpretation of Federal Law**

68.     For an agency's interpretation of a statute to be valid under the APA, it "must operate within the bounds of reasonable interpretation."[81]  The OCC's interpretation is unreasonable and thus invalid, on a number of grounds.

69.     First, the True Lender Rule radically deviates from the established true lender analysis applied by courts for centuries.  As noted above, in determining whether a loan is usurious, the law has historically looked to the substance of the transaction, not its form, and factfinders carefully scrutinize transactions to see which party – the National Bank or the non-bank – is the "true lender" of the loan, usually looking to see which party had the predominant economic interest in the loan.

70.     The OCC's interpretation as set forth in the True Lender Rule is unreasonable because it is designed to foreclose this scrutiny by supplanting longstanding statutory and case law with an artificial and unprecedented standard that directly conflicts with existing law.  The True Lender Rule eschews the economic realities of the lending transaction and gives dispositive effect to a National Bank being named as lender in the loan agreement or funding the loan.  The OCC has pointed to no court or regulator that has ever used the standard that OCC adopted.

---

[81] *Util. Air Reg. Grp.,* 573 U.S. at 321.

Replacing the true lender analysis established by longstanding statutory and case law with such an artificial and unprecedented standard is unreasonable.[82]

71.     Second, the True Lender Rule distorts federal law.  The reason Congress authorized National Banks to preempt state interest-rate laws is because National Banks were subject to comprehensive regulatory oversight aimed at preventing National Banks from abusing this valuable privilege.

72.     The True Lender Rule would permit partnerships where National Banks are identified as the lender on loan agreements; non-banks market, fund, originate, and service the loans; the loans are sold to the non-banks immediately after origination (sometimes within hours); and the OCC has no oversight authority over the non-banks.  Put differently, the True Lender Rule would permit non-banks to enjoy the benefits of NBA preemption without submitting to any type of oversight.

73.     The United States Supreme Court has rejected an interpretation of the NBA that would permit activities subject to the oversight of neither federal nor state regulators.[83]  Under the APA, an agency interpretation that is "inconsistent with the design and structure of the statute as a whole" is not reasonable,[84] and the True Lender Rule is inconsistent with the design and structure of the NBA.

---

[82] *See, e.g.*, *United States v. Boyle*, 469 U.S. 241, 246 n.4 (1985) (holding that an agency's interpretation is reasonable when it "is consistent with Congress' intent, and over 40 years of case law").

[83] *See First Nat'l Bank v. Missouri*, 263 U.S. 640, 659-61 (1924); *see also Madden v. Midland Funding, LLC*, 786 F.3d 246, 251-52 (2d Cir. 2015), *cert. denied*, 136 S. Ct. 2505 (2016) (noting that extending the NBA to third-party debt buyers could place them outside the reach of federal or state regulators).

[84] *Util. Air Reg. Grp.,* 573 U.S. at 321.

74. Third, the True Lender Rule would not solve the problem it claims to remedy. The OCC argues that the True Lender Rule is designed to replace an unpredictable, subjective, and fact-intensive inquiry with a "simple, bright-line test,"[85] but the test advanced by the Rule will not accomplish this goal. The True Lender Rule does not define what it means to "fund" a loan, or address the likelihood that courts trying to make such a determination would conduct precisely the type of fact-intensive inquiries the OCC criticizes. For example, lines of credit extended by National Banks to non-banks could require resolution of fact-intensive questions under the True Lender Rule.

75. The OCC's inadequate responses to comments that raised this concern further demonstrate the Rule's unreasonableness.[86] The OCC offers two responses: 1) "While the OCC understands its rule may not resolve all legal uncertainty for every loan, this is not a prerequisite for the agency to take this narrowly tailored action"[87]; and 2) "Although the OCC is confident that its rule provides a clear and simple test for determining who is the true lender, the agency recognizes that, on occasion, there may be additional circumstances in which its application is unclear. In these circumstances, banks with questions should contact the OCC."[88] But an

---

[85] True Lender Rule, 85 Fed. Feg. at 68,743.

[86] *See, e.g.*, Attorneys General Comment at 12; *see also* True Lender Rule, 85 Fed. Reg. at 68,745 ("Other commenters supported the proposal as a general matter but suggested specific changes, including clarifying that the funding prong does not include certain lending or financing arrangements such as warehouse lending, indirect auto lending (through bank purchases of retail installment contracts (RICs)), loan syndication, and other structured finance.").

[87] True Lender Rule, 85 Fed. Reg. at 68,744.

[88] *Id.* at 68,745 n.18.

"unclear" rule that can be applied only by contacting its author falls far short of the OCC's stated aim of a "clear, predictable, and easily administrable test[.]"[89]

76.     Fourth, the OCC's justification for the "funds the loan" prong of the True Lender Rule's categorical approach[90] is inconsistent with its refusal to consider whether a non-bank funds a loan.  In its initial proposal, the OCC justified the "funds the loan" prong by explaining that "if a bank funds a loan as of the date of origination, the OCC concludes that it has a predominant economic interest in the loan and, therefore, has made the loan – regardless of whether it is the named lender in the loan agreement as of the date of origination."[91]  As the only support for that conclusion, the OCC stated that "while courts have relied on a multitude of factors to evaluate which party has the predominant economic interest in a loan, the OCC believes that such a fact-specific analysis is unnecessarily complex and unpredictable."[92]

77.     In other words, the OCC's justification accepts that determining which party holds the "predominant economic interest" should establish the true lender, and seeks a simpler test to make the determination.  It thus provides no justification for the True Lender Rule's failure to apply the "funds the loan" categorical rule when a non-bank is the funder and a National Bank is the lender on the face of the loan agreement.

---

[89] *Id.* at 68,743.

[90] 12 C.F.R. § 7.1031(b)(2).

[91] *See* OCC, *National Banks and Federal Savings Associations as Lenders*, 85 Fed. Reg. at 44,225.  The OCC offers no further justification in finalizing the rule.

[92] *Id.* at 44,225 n.24; *see also* True Lender Rule, 85 Fed. Reg. at 68,745 n.14 ("Even when nominally engaged in the same analysis—determining which entity has the 'predominant economic interest' in the transaction—courts do not necessarily consider all of the same factors or give each factor the same weight.").

78.     The OCC acknowledges that it received comments recommending that the True Lender Rule "adopt[] a test that requires the true lender to have a predominant economic interest in the loan."[93]  Despite promising to respond to such comments, the OCC never actually addresses them in its response to comments.

79.     Finally, the OCC's "funds the loan" approach would likewise offer no clarity to the borrower as to what substantive law governs the loan.  A borrower likely would be unaware that she has lost the protection of state law merely because a National Bank – not named as the lender on loan documents and potentially unknown to the borrower – happens to fund the loan behind the scenes even when it lacks a predominant economic interest in the loan.

### C.     The OCC Failed to Comply with Provisions of the Dodd-Frank Act Intended to Constrain Preemption Determinations by the OCC

80.     In the 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"),[94] Congress imposed substantive and procedural requirements that the OCC must observe when it seeks to preempt any "State consumer financial law,"[95] such as state-law interest-rate limitations and the true lender doctrines that determine their applicability.[96]

---

[93] True Lender Rule, 85 Fed. Reg. at 68,743.

[94] Pub. L. 111-203, 124 Stat. 1376 (2010).

[95] *See* 12 U.S.C. § 25b(b) (imposing procedural and substantive requirements on OCC's preemption under the NBA of state consumer financial law); *see also id.* § 1465(a) (requiring the OCC to make any preemption determination relating to savings associations "in accordance with the laws and legal standards applicable to national banks regarding the preemption of State law," *i.e.*, those imposed by section 25b).

[96] "The term 'State consumer financial law' means a State law that does not directly or indirectly discriminate against national banks and that directly and specifically regulates the manner, content, or terms and conditions of any financial transaction (as may be authorized for national banks to engage in), or any account related thereto, with respect to a consumer." 12 U.S.C. § 25b(a)(2).  State rate caps, and the true lender doctrines that determine their applicability, regulate the terms and conditions of financial transactions with respect to

Congress did this in response to concerns that prior preemption determinations by the OCC failed to take adequately into account the interests of consumers.[97]  The OCC claims (incorrectly) that these requirements do not apply, and as a consequence the OCC took no steps to fulfill them.

81.     In section 25b, Congress imposed the following limitations on OCC preemption determinations:

   a)   Before making a preemption determination, the OCC "shall first consult with the Bureau of Consumer Financial Protection and shall take the views of the Bureau into account."[98]

   b)   The OCC shall make such determinations on a "case-by-case basis" in which the Comptroller must determine "the impact of a particular State consumer financial law on [a] national bank that is subject to that law."[99]

   c)   The NBA preempts State consumer financial laws *only* when the state law "prevents or significantly interferes with the exercise by the national bank of its powers" as described by the Supreme Court in *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25 (1996).[100]

   d)   "'[T]he OCC may not deem preempted a provision of a state consumer financial law 'unless substantial evidence, made on the record of the proceeding, supports the specific finding regarding the preemption of such provision in accordance with [*Barnett Bank*].'"[101]

---

consumers by limiting the rates of interest that non-bank lenders may charge consumers, and thus fit squarely in § 25b's definition of "State consumer financial law."

[97] S. Rep. No. 111-176, at 15-17 (2010).

[98] 12 U.S.C. § 25b(b)(3)(B).

[99] *Id.* § 25b(b)(1)(B) & (3)(A).

[100] *Id.* § 25b(b)(1)(B); *see also Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185, 1191-92 (9th Cir.), *cert. denied*, 139 S. Ct. 567 (2018).

[101] *Lusnak*, 883 F.3d at 1194 (quoting 12 U.S.C. § 25b(c)).

82.     The OCC has failed to abide by these procedural and substantive requirements.

83.     Procedurally, the True Lender Rule ignores the consultation requirement, never mentioning whether the agency has completed or plans to complete the required consultation with the Consumer Financial Protection Bureau ("CFPB").  This omission is particularly glaring given that the CFPB has itself recently embraced the traditional true lender analysis when challenging a lending program involving consumer loans made above state usury limits.[102]

84.     The True Lender Rule likewise shows no signs of the required "case-by-case" consideration of the impact of true lender laws on a National Bank.[103]  The OCC speculates that "uncertainty" about state treatment of rent-a-bank schemes *may* deter National Banks from entering into such arrangements,[104] but nowhere does the OCC analyze whether true lender laws, as well as rate caps applied to non-bank lenders, "prevent[] or significantly interfere[] with the exercise by the national bank of its powers."

85.     Substantively, the OCC could not possibly meet this standard.

86.     First, helping a non-bank lender evade state usury laws is not a power of a National Bank.

87.     Second, true lender laws and doctrines do not prevent National Banks from making loans on their own, entering into lending partnerships with other National Banks, or entering into lending partnerships with non-banks.  True lender laws and doctrines only impact the interest rate a non-bank could charge on a loan.  And state interest-rate caps that would apply

---

[102] *See CFPB v. CashCall, Inc.*, Case No. 15-CV-7522, 2016 WL 4820635 (C.D. Cal. Aug. 31, 2016).

[103] 12 U.S.C. § 25b(3).

[104] *See* True Lender Rule, 85 Fed. Reg. at 68,742.

to non-bank lenders in the absence of the True Lender Rule likewise do not burden National Banks.[105]

88.     Moreover, the OCC has not adduced or evaluated the "substantial evidence, made on the record" that is required to preempt state law.[106]  In fact, it has not identified *any* evidence that true lender laws prevent or significantly interfere with a National Bank's exercise of its powers.

89.     Instead, the OCC explicitly refused to comply with these requirements that Congress enacted to restrain the OCC's preemption determinations,[107] incorrectly asserting that the requirements "are inapplicable to this rulemaking."[108]  As explained earlier, the True Lender Rule is a preemption regulation, notwithstanding the OCC's tortured arguments to the contrary.[109]

90.     Like all federal agencies, the OCC is bound to act in accordance with the procedural and substantive requirements Congress has set forth.  It has not done so.

---

[105] *C.f. Hymes*, 408 F. Supp. 3d at 194 ("At minimum, obviously, state laws that merely affect or minimally impact the exercise of banking powers are not preempted.  As noted earlier, national banks are subject to an array of state laws – contract law, tort law, criminal law, law regarding the transfer of real property – which apparently fall into this category.").

[106] 12 U.S.C. § 25b(c).

[107] *See, e.g.*, S. Rep. No. 111-176, at 15-17 (2010).

[108] True Lender Rule, 85 Fed. Reg. at 68,744.

[109] *Compare id.* ("This rulemaking does not preempt a state consumer financial law but rather interprets a *bank's federal authority* to lend.") (emphasis added), *with Tex. Bankers Ass'n v. Bomer*, Civil No. A-96-CA-694 JN, 1997 U.S. Dist. LEXIS 13422, at *7 (W.D. Tex. Aug. 7, 1997) (engaging in preemption analysis when "there is a direct conflict between *banks' authority under federal law* and restrictions on that authority under Texas law") (emphasis added).

### D. The True Lender Rule Reverses Longstanding OCC Opposition to Rent-a-Bank Schemes with No Reasoned Explanation

91.     The True Lender Rule is contrary to longstanding policy of the OCC, which has strongly condemned rent-a-bank schemes in which a National Bank merely acts as a conduit for loans that are illegal under states' usury laws.  Indeed, with no basis in fact, law, or policy, the True Lender Rule reverses prior OCC policy and practice to instead endorse sham arrangements between non-bank lenders and National Banks under which the bank has no meaningful involvement in the marketing, origination, or underwriting of the loans, nor the preponderant economic interest in the loans.  By endorsing these sham arrangements, the OCC turns a blind eye to its own historical opposition to rent-a-bank schemes and to the prospect of abusive, triple-digit interest-rate loans being made to financially distressed consumers in States that expressly forbid such loans.

92.     In the late 1990s, numerous payday lenders engaged in subterfuges to circumvent state usury laws.  A common subterfuge was the rent-a-bank model under which the payday lenders claimed they were not making the loans themselves, but were merely the marketing, processing and servicing agents of National Banks and out-of-state state-chartered banks.  In 2000, recognizing the harms caused by high-cost, short-term consumer loans by payday lenders that entered into sham arrangements with National Banks, the OCC issued guidance cautioning National Banks against entering into these arrangements.  The OCC guidance provided:

> [S]ome national banks have entered into arrangements with third parties in which the national bank funds payday loans originated through the third party.  In these arrangements, national banks often rely on the third party to provide services that the bank would normally provide itself.  These arrangements may also involve the sale to the third party of the loans or the servicing rights to the loans.  Such third-party arrangements significantly increase risks to the bank and the OCC's supervisory concerns…. Payday lenders entering into

such arrangements with national banks should not assume that the benefits of a bank charter, particularly with respect to the application of state and local law, would be available to them.[110]

93.    The OCC guidance acknowledged that these arrangements carry risks to National Banks, including credit, transactional, and reputational risks:

> ● Credit Risk…. Contractual agreements with third parties that originate, purchase, or service payday loans may increase the bank's credit risk due to the third party's inability or unwillingness to meet the terms of the contract…. The risk from the third party's failure to meet the terms of the contract also results in increased compliance, reputation, and legal risk.
>
> ● Transaction Risk.  Payday loans are a form of … lending not typically found in national banks but are frequently originated by unregulated nonbank firms…. Because payday loans may be underwritten off-site, there is the risk that agents or employees may misrepresent information about the loans or increase credit risk by failing to adhere to established underwriting guidelines.
>
> ● Reputation Risk…. [B]anks face increased reputation risk when they enter into arrangements with third parties to offer payday loans with fees, interest rates, or other terms that could not be offered by the third party directly.[111]

94.    In the early 2000s, consistent with its guidance, the OCC took action against at least four National Banks that had entered into rent-a-bank schemes with non-bank payday lenders; the OCC's orders required the National Banks to terminate their partnerships with the payday lenders and to cease making the loans.[112]

---

[110] OCC Advisory Letter No. 2000-10 (Nov. 27, 2000).

[111] *Id.*

[112] OCC News Release 2002-1 (Jan. 3, 2002) (Eagle National Bank); OCC Consent Order 2002-93 (Oct. 28, 2002) (Goleta National Bank); OCC News Release 2003-3 (Jan. 31, 2003) (First National Bank of Brookings); OCC News Release 2003-6 (Jan. 31, 2003) (Peoples National Bank).

95. In issuing the OCC's enforcement order against Eagle National Bank in 2002, Comptroller of the Currency John D. Hawke, Jr. admonished that Eagle "essentially rented out its national bank charter to a payday lender" and that its actions were "in violation of a multitude of standards of safe and sound banking, compliance requirements, and OCC guidance." Comptroller Hawke further stated:

> [Eagle's actions] demonstrates the dangers inherent in arrangements under which national banks rent out their charters to nonbank providers of financial services . . . . Not only did Eagle allow itself to become a mere appendage to Dollar, but it effectively collaborated in Dollar's scheme to evade state law requirements that would otherwise be applicable to it.[113]

96. In 2002, Comptroller Hawke again warned National Banks against entering into rent-a-bank schemes. Observing that "the predominant economic interest in the typical arrangement belongs to the payday lender, not the bank," Comptroller Hawke pronounced that the arrangements were an "abuse of the national charter":

> The benefit that national banks enjoy by reason of this important constitutional doctrine [of preemption] cannot be treated as a piece of disposable property that a bank may rent out to a third party that is not a national bank. Preemption is not like excess space in a bank-owned office building. It is an inalienable right of the bank itself.
>
> We have recently seen several instances in which nonbank lenders who would otherwise have been fully subject to various state regulatory laws have sought to rent out the preemption privileges of a national bank to evade such laws. Indeed, the payday lending industry has expressly promoted such a "national bank strategy" as a way of evading state and local laws. Typically, these arrangements are originated by the payday lender, which attempt[s] to clothe itself with the status of an "agent" of the national bank. Yet the predominant economic interest in the typical arrangement belongs to the payday lender, not the bank.

---

[113] OCC News Release 2002-1.

> Not only do these arrangements constitute an abuse of the national charter, but they are highly conducive to the creation of safety and soundness problems at the bank, which may not have the capacity to manage effectively a multistate loan origination operation that is in reality the business of the payday lender.[114]

97.     Similarly, in a preemption opinion issued in 2001 that supported the authority of a National Bank to use car dealer agents to originate loans, the OCC noted the fact of the National Bank's preponderant economic interest in the loans.  As the OCC remarked:  "This is not a situation where a loan product has been developed by a non-bank vendor that seeks to use a national bank as a delivery vehicle, and where the vendor, rather than the bank, has the preponderant economic interest in the loan."[115]  The OCC thus carefully distinguished the car financing situation from the payday lending rent-a-bank scenario.

98.     Notably, in 2001, the OCC expressly disavowed attempts by a payday lender to cloak itself with federal preemption when the State of Colorado took enforcement action against the lender for entering into a rent-a-bank scheme with a National Bank to make usurious loans to Colorado consumers.  In an amicus brief filed with the federal court in Colorado, the OCC made clear that the rights of federal preemption did not attach to the non-bank payday lender:

> The standard for finding complete preemption is not met in this case.  While the Defendant's Notice of Removal repeatedly refers to Goleta National Bank using Ace Cash Express, Inc. ("ACE") as its agent to solicit loans …, ACE is the only defendant in this action, and ACE is not a national bank.  Nor do the [the State's] claims against ACE arise under the National Bank Act, or other federal law.  Although [ACE] apparently attempts to appropriate attributes of the legal status of a national bank for its own operations as a defense to certain

---

[114] John D. Hawke, Jr., Comptroller of the Currency, *Remarks Before the Women in Housing and Finance* at 10 (Feb. 12, 2002).

[115] OCC Preemption Determination 01-10, 66 Fed. Reg. 28,593, 28,595 n.6 (May 23, 2001).

of [the State's] claims, such a hypothetical conflict between
federal and state law does not give this court federal questions
jurisdiction under the doctrine of complete preemption. [116]

99.     Further, as recently as 2018, in small dollar loan guidance, the OCC declared that

it "views unfavorably an entity that partners with a bank with the sole goal of evading a lower

interest rate established under the law of the entity's licensing state(s)."  However, shortly before

promulgating this True Lender Rule, the OCC inexplicably withdrew that guidance.[117]

100.     As this history shows, for many years, the OCC has recognized that arrangements

between non-bank lenders and National Banks constitute an "abuse of the national charter" when

they are made simply to evade state interest-rate laws.  Moreover, the OCC's pronouncements,

enforcement actions, and opinion make plain that a crucial indication of these sham

arrangements is the non-bank lender's preponderant economic interest in the loan, rather than the

National Bank's.

101.     However, in clear contravention of its previous policy and practice, the OCC's

True Lender Rule would instead permit non-bank lenders and their National Bank partners to

manipulate loan transactions with impunity to designate the National Bank as the lender,

regardless of which entity has the actual preponderant economic interest in the loan and is, in

fact, the true lender – thereby manifestly elevating form over substance.

102.     The OCC denies that the True Lender Rule reverses its prior policy and practice

based on its specious assertion that the True Lender Rule "solve[s] the rent-a-[bank] issues raised

---

[116] Comptroller of the Currency's Brief As Amicus Curiae In Support of Plaintiffs'
Motion to Remand, *Salazar v. Ace Cash Express, Inc.*, No. 1:01-cv-1576-WYD-OES (D. Colo.
Sept. 27, 2001).

[117] OCC Bulletin 2018-14: Installment Lending: Core Lending Principles for Short-Term,
Small-Dollar Installment Lending (May 23, 2018), *rescinded by* OCC Bulletin 2020-54 (May 20,
2020).

and ensure[s] that banks do not participate in those arrangements." [118]  Accordingly, the OCC

does not explain or substantiate why it now departs from its previous findings and policy

concerns.  As observed by the Supreme Court, "[a]n agency may not . . . depart from a prior

policy *sub silentio* or simply disregard rules that are still on the books."[119]  In reversing its

policy, the OCC must provide "a reasoned explanation . . . for disregarding facts and

circumstances that underlay . . . the prior policy"[120] – which it has completely failed to do.

### E.      The OCC's Reliance on Its "Robust" Oversight Is Undermined By the OCC's Recent Embrace of Predatory Lenders

103.      In response to concerns that the True Lender Rule will encourage predatory

lending,[121] the OCC argues that "the OCC's statutes and regulations, enforceable guidelines,

guidance, and enforcement authority provide robust and effective safeguards against predatory

lending"[122]  As previously noted, the OCC further asserts that "[i]n fact, this rulemaking would

solve the rent-a-[bank] issues raised [by commenters] and ensure that banks do not participate in

those arrangements."[123]

104.      Much of the OCC's supervisory work is non-public, so there is no way to

determine whether the OCC does, in fact, use the supervision process to deter predatory lending.

---

[118] True Lender Rule, 85 Fed. Reg. at 68,744.

[119] *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

[120] *Id.* at 515-16; *see also Encino Motorcars*, 136 S. Ct. at 2125-27 (holding that a regulation promulgated by the Department of Labor was "arbitrary and capricious" because it was "issued without the reasoned explanation that was required in light of the Department's change in position and the significant reliance interests involved").

[121] *See, e.g*, Attorneys General Comment at 20 ("[T]he OCC has failed to address the fact that the Proposed Rule will incentivize and sanction predatory lending . . . .").

[122] True Lender Rule, 85 Fed. Reg. at 68,744.

[123] *Id.*

In public, however, the OCC has recently taken action that cast serious doubt on the OCC's statement that its oversight will prevent predatory lending.

105.    Axos Bank, formerly known as BofI Federal Bank, is an OCC-regulated National Bank that partners with a non-bank lender called World Business Lenders, LLC ("WBL") to make loans in excess of state usury caps.[124] On September 10, 2019, the OCC and the FDIC filed an amicus brief in a Colorado bankruptcy proceeding that concerned a loan sold to WBL.[125] The OCC and FDIC argued that WBL should be permitted to charge a triple-digit interest rate (120.86%) to a Colorado resident notwithstanding Colorado law that would prohibit charging such a rate.[126] The OCC was not a party to the case and there was no apparent reason for the OCC to go out of its way to support a predatory lender, but that is precisely what the OCC did.

106.    The OCC also supervises another National Bank that has partnered with a non-bank to offer loans at triple-digit interest rates. Last year the online lender Curo Financial entered into a partnership with Stride Bank, N.A. – an Oklahoma-based bank regulated by the OCC – to offer its Verge Credit loans to subprime borrowers at rates that would violate most

---

[124] *See* Gretchen Morgenson, *New Trump Admin Rules Make It Easier for Lenders to Charge Small Businesses Super-High Interest Rates*, NBC News, Dec. 8, 2020, *available at* https://www.nbcnews.com/business/economy/new-trump-administration-rules-make-it-easier-lenders-charge-small-n1250023; *Kaur*, 440 F. Supp. 3d at 114-15; *see also* CRL Comment at 52-56.

[125] *See In re Rent-Rite SuperKegs W. Ltd.*, --- B.R. ----, Case No. 19-CV-01552-RBJ, 2020 WL 6689166, at *1 (D. Colo. Aug. 12, 2020).

[126] *See* Amicus Brief of the Federal Deposit Insurance Corporation and the Office of the Comptroller of the Currency in Support of Affirmance and Appellee, p. 4, *In re Rent-Rite Super Kegs W. Ltd.*, Case No. 19-cv-01552-REB (D. Colo.). (Doc. No. 11).

state usury caps.[127]  Verge Credit even touts on its website that its relationship with Stride Bank makes its online subprime loans "100% legit."[128]

107.    Although comments submitted during the rulemaking drew the OCC's attention to the predatory loans that Axos Bank and Stride Bank are currently facilitating as National Banks,[129] the OCC did not address this issue.  Accordingly, the OCC's justification that the True Lender Rule "will ensure that banks understand that the OCC *will continue* to hold banks accountable for their lending activities" defies the factual record.[130]  The APA prohibits exactly that type of counterfactual decision making.[131]

### F.    The True Lender Rule Is Not Entitled to Deference

108.    Following Congress's recognition of the OCC's role in fostering abusive lending practices before the 2008 financial crisis,[132] Congress stripped the agency of the *Chevron* deference standard to which agency rulemakings are generally entitled.[133]

109.    Congress clarified in the Dodd-Frank Act that the validity of OCC rules that preempt state law must be assessed "depending upon the thoroughness evident in the

---

[127] *See* Curo Group Holding Corp. 2019 Form 10-K, p. 7, *available at* https://ir.curo.com/~/media/Files/C/Curo-IR/documents/2019-curo-annual-report.pdf; *see also* CRL Comment at 56.

[128] https://www.vergecredit.com.

[129] *See, e.g.*, CRL Comment at 52-56.

[130] True Lender Rule, 85 Fed. Reg. at 68,746-47 (emphasis added).

[131] *State Farm*, 463 U.S. at 43 (holding that the APA prohibits an agency "offer[ing] an explanation for its decision that runs counter to the evidence before the agency").

[132] *E.g.*, Senate Report. No. 111-176, at 15-17 (2010), *available at* https://www.govinfo.gov/content/pkg/CRPT-111srpt176/pdf/CRPT-111srpt176.pdf.

[133] *See Lusnak*, 883 F.3d at 1192 (citing 12 U.S.C. § 25b(b)(5)(A) and *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

consideration of the agency, the validity of the reasoning of the agency, the consistency with other valid determinations made by the agency, and other factors which the court finds persuasive and relevant to its decision."[134]

110.     In other words, the True Lender Rule is "entitled only to *Skidmore* deference," under which "an agency's views are 'entitled to respect' only to the extent that they have the 'power to persuade.'"[135]

## V.     The States Have Standing to Challenge the True Lender Rule

111.     The True Lender Rule injures concrete and distinct interests of the plaintiff States, including the States' sovereign, quasi-sovereign, and fiscal interests, any one of which is sufficient to support the States' standing to bring this APA action.

### A.     Sovereign Interests

112.     Each of the States has a sovereign interest in the protection and enforcement of its laws that, as discussed below, carefully regulate the interest that may be charged on consumer loans and prevent evasion.

113.     These sovereign interests are concretely and particularly harmed by the True Lender Rule because the Rule would preempt the States' enforcement of their laws against non-banks that enter into sham partnerships with National Banks.  These harms to the States' interests

---

[134] 12 U.S.C. § 25b(b)(5)(A).

[135] *Lusnak*, 883 F.3d at 1192.  As the Ninth Circuit has noted, § 25b(b)(5)(A) codifies existing law set forth by the Supreme Court:  Regulations such as the OCC's interpretation of the NBA preemption standard "should receive, at most, *Skidmore* deference" and "the weight to be accorded to an agency's explanation of a state law's impact on a federal scheme depends on its thoroughness, consistency, and persuasiveness."  *Id.* at 1192-93

are directly traceable to the True Lender Rule, and an order setting aside the True Lender Rule would redress the States' injuries.

114.    Among the most significant powers of a state is the "exercise of sovereign power over individuals and entities," which "involves the power to create and enforce a legal code, both civil and criminal."[136]  Enforcing state law is one of the "quintessential functions of a State."[137]  This interest is unique to sovereign entities, like the States, because they alone are "entitled to create a legal code" and thus they have the most "direct stake . . . in defending the standards embodied in that code."[138]  Thus, states "have an interest, as sovereigns, in exercising 'the power to create and enforce a legal code.'"[139]  States have standing to sue the federal government where a federal law or federal action with the force of law impairs the states' legitimate, sovereign interest in the continued enforceability of their own statutes.[140]

### 1.    New York Usury Laws

115.    New York has both a civil usury rate, set at 16% interest per year, and a criminal usury rate, set at 25% interest per year.[141]  With the exception of loans by lenders licensed by New York, loans under $250,000 are considered usurious if the interest rate exceeds 16%, while loans in excess of $250,000 are considered usurious if the interest rate exceeds 25%.  Lenders

---

[136] *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982).

[137] *Diamond v. Charles*, 476 U.S. 54, 65 (1986).

[138] *Id.*

[139] *State of Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 (D.C. Cir. 1989).

[140] *See, e.g.*, *California v. Trump*, --- F.3d ---, 2020 WL 3480841, at *5-6 (9th Cir. June 26, 2020) (states have standing to challenge federal action to vindicate states' "sovereign interests in enforcing their environmental laws"); *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1239-40 (10th Cir. 2008) ("[f]ederal regulatory action that preempts state law creates a sufficient injury-in-fact to" demonstrate state standing).

[141] N.Y. Gen. Oblig. Law §§ 5-501, 5-511; N.Y. Banking Law § 14-a; N.Y. Penal Law §§ 190.40, 190.42.

licensed by New York can engage in the business of making personal loans of $25,000 or less to consumers in New York, or loans of $50,000 or less to businesses, and can charge, contract for, or receive a rate of interest above 16%, but in no event can they charge more than 25%.[142]

116.    New York has prohibited usurious interest rates for centuries[143] as a fundamental public policy of the State,[144] and state regulators have "aggressively enforced those laws in order to protect desperately poor people from the consequences of their own desperation."[145]

117.    New York's status as the nation's financial capital and one of its most populous states has consistently attracted unscrupulous companies eager to increase their profits by lending money to New Yorkers at triple-digit interest rates.

118.    The New York Attorney General, as New York's chief law-enforcement officer, enforces the usury cap pursuant to its authority under New York Executive Law § 63(12), which prohibits "repeated fraudulent or illegal acts . . . in the carrying on, conducting or transaction of business."

119.    The New York Attorney General has repeatedly taken action to enforce the usury cap.[146]  In one case, the New York Attorney General obtained a $5.2 million settlement from a

---

[142] *See* N.Y. Banking Law §§ 340, 356.

[143] *See Madden v. Midland Funding, LLC*, 237 F. Supp. 3d 130, 150 (S.D.N.Y. 2017) ("New York's usury prohibition is not a creature of recent statute, but rather one that reflects a deep-rooted tradition of the common weal.").

[144] *See Power Up Lending Grp., Ltd. v. All. Bioenergy Plus, Inc.*, Case No. 18-CV-3601, 2019 WL 1322621, at *5 (E.D.N.Y. Feb. 28, 2019) (gathering cases for the proposition that "New York's usury prohibition constitutes a fundamental public policy").

[145] *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 108 (2d Cir. 2014).

[146] *See, e.g.*, *Consumer Fin. Prot. Bureau v. RD Legal Funding, LLC*, 332 F. Supp. 3d 729, 780 (S.D.N.Y. 2018); *People v. County Bank of Rehoboth Beach, Del.*, 45 A.D.3d 1136, 1137-38 (3d Dep't 2007); *People v. JAG NY, LLC*, 18 A.D.3d 950, 951-53 (3d Dep't 2005).

Delaware-based bank and non-bank lender that entered into a rent-a-bank scheme to offer illegal payday loans to New Yorkers.[147]

120.    The usury cap is also enforced by the New York Department of Financial Services ("DFS"), which licenses, regulates, and supervises state and international banks, insurance companies, and non-bank financial services firms with approximately $7 trillion in assets.[148]

121.    The non-bank entities supervised by DFS include licensed lenders, real-estate lenders, mortgage servicers, sales and premium finance companies, pre-paid card issuers, money transmitters, virtual-currency businesses, check cashers, and budget planners.[149]

---

[147] *See* Press Release, *Attorney General Cuomo Announces Distribution Of $5.2 Million Settlement In "Rent-A-Bank" Payday Lending Scheme*, Nov. 17, 2009, *available at* https://ag.ny.gov/press-release/2009/attorney-general-cuomo-announces-distribution-52-million-settlement-rent-bank.

[148] *See* N.Y. Fin. Servs. Law §§ 101 *et seq*.; N.Y. Banking Law § 14-a. DFS is statutorily mandated to, *inter alia*: "establish a modern system of regulation, rule making and adjudication that is responsive to the needs of the banking and insurance industries and to the needs of the state's consumers and residents," "provide for the effective and efficient enforcement of the banking and insurance laws," "provide for the regulation of new financial services products," "promote the prudent and continued availability of credit, insurance and financial products and services at affordable costs to New York citizens, businesses and consumers," "ensure the continued safety and soundness of New York's banking, insurance and financial services industries, as well as the prudent conduct of the providers of financial products and services, through responsible regulation and supervision," "protect the public interest and the interests of depositors, creditors, policyholders, underwriters, shareholders and stockholders," and "promote the reduction and elimination of fraud, criminal abuse and unethical conduct by, and with respect to, banking, insurance and other financial services institutions and their customers." N.Y. Fin. Servs. Law § 102.

[149] *See* N.Y. Fin. Servs. Law §§ 101 *et seq*.

## 2. California Rate Caps

122.  California has two statutory schemes, the California Financing Law ("CFL") and the California Deferred Deposit Transaction Law ("CDDTL"), that, among other things, regulate the interest that may be charged on consumer loans.[150]

123.  The CFL requires finance lenders and brokers to be licensed by the California Department of Financial Protection and Innovation (formerly known as the California Department of Business Oversight),[151] a state agency charged with regulating and overseeing the activities of payday lenders, finance lenders and brokers, state-licensed banks and savings associations, and other entities.[152]

124.  The CFL caps the interest rates state-licensed lenders may "contract for" or "receive" on consumer loans under $10,000.  For loans under $2,500, the CFL imposes a graduated rate cap.[153]  For loans between $2,500 and $9,999, the CFL prohibits interest rates exceeding an annual simple interest rate of 36% per year plus the Federal Funds Rate.[154]

125.  Before 2019, the CFL had provided a graduated rate cap only for loans of less than $2,500.[155]  However, many lenders evaded this cap by offering high-interest loans just

---

[150] In addition to these statutory schemes, the California Supreme Court has held that loans not violating the state's rate caps, but nonetheless charging rates of interest that are excessive under the circumstances, may be deemed "unconscionable" and thus unlawful and actionable under the state's Unfair Competition Law (California Business and Professions Code § 17200).  *See generally De La Torre v. CashCall, Inc.*, 5 Cal. 5th 966 (2018).

[151] Cal. Fin. Code §§ 22009, 22100.

[152] *Id.* § 300.

[153] *Id.* §§ 22303, 22304, 22306.

[154] *Id.* §§ 22304.5, 22306.

[155] *Id.* §§ 22303, 22304.

above $2,500.[156]  For example, in 2018, less than 3% (fewer than 46,000) of all CFL-covered

loans were for between $2,000 and $2,499, while nearly 36% (nearly 600,000) of all CFL-

covered loans were for between $2,500 and $4,999.[157]  Fifty-five percent of those latter loans

charged an annual percentage rate of 100% or more.[158]

126.    To protect consumers from high-cost, predatory loans, the California Legislature

enacted legislation in October 2019 that limits the interest rate for loans of at least $2,500 and

under $10,000.[159]

127.    The California Legislature was well-attuned to the potential for scheming by

regulated entities to evade the law and sought to prevent evasion.  To prevent lenders from

evading the CFL's rate caps by artificially increasing the size of a loan, the CFL establishes

whether and which rate caps apply based on a loan's "bona fide principal amount."[160]  The "bona

fide principal amount" excludes loan amounts in excess of what the borrower applies for if the

borrower "by prearrangement or understanding" is to make a substantial repayment to the lender

"within a short time after the making of the loan" and specified conditions are met.[161]  Thus, for

---

[156] *See, e.g.*, *De La Torre*, 5 Cal. 5th 966; Cal. Leg. Asm. Comm. On Banking and Finance, Analysis of A.B. 538 (Limón) 3-5, *Legislative Counsel's Digest* (Mar. 28, 2019), https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201920200AB539.

[157] California Department of Business Oversight, *California Department of Business Oversight Annual Report* 9 (June 2018), https://dbo.ca.gov/wp-content/uploads/sites/296/2019/08/CFL-Annual-Report-2018-FINAL-8-8-19.pdf

[158] *Id.* at 13.

[159] Cal. Leg., A.B. 539 (Oct. 10, 2019), https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=201920200AB539 (chaptered at Cal. Fin. Code § 22304.5).

[160] Cal. Fin. Code §§ 22303, 22304, 22304.5.

[161] *Id.* § 22251.

example, lenders may not evade the CFL's rate caps by lending $11,000 to a borrower seeking only $9,000 with the understanding that the borrower will immediately return the excess $2,000.

128.    The CDDTL likewise limits the interest chargeable on short-term deferred-deposit transactions, commonly known as payday loans.[162]  The CDDTL also contains several provisions aimed at preventing lenders from evading California law through partnerships with out-of-state entities.[163]  For example, it provides that loans made out of state are enforceable in California only "to the extent of but not to exceed the unpaid principal balance and the aggregate amount of interest . . . and all other charges permitted" by California law.[164]  That is, non-bank entities seeking to enforce loans in California may not collect interest at rates above what is permitted under California law.  The CDDTL applies to "[a]ny person" that seeks to collect, in California, interest and unpaid balances on deferred deposit transactions[165] and "[a]ny person" who arranges, in California, the making of a deferred deposit transaction outside of the state for the purpose of evading the CDDTL.[166]

129.    The threat to California's enforcement of its laws posed by the Rule's facilitation of rent-a-bank schemes is apparent and immediate.  Even before the passage of California's 36%

---

[162] Cal. Fin. Code §§ 23001 *et seq.*, 23036(a).

[163] The CDDTL allows state-licensed lenders to participate in certain partnership arrangements with banks that are not subject to the CDDTL but requires state licensees to comply with all provisions of the CDDTL "not preempted by other state and federal laws."  *Id.* § 23037(i).

[164] *Id.* § 22322; *see also id.* at § 22323.

[165] *Id.* § 22323.

[166] *Id.* § 22324.

rate cap, several state-licensed lenders publicly announced their intention to evade California's interest-rate restrictions by partnering with banks.[167]

130.    The True Lender Rule will further incent and enable such state-law evasion.  The Rule will facilitate rent-a-bank schemes by lending federal support to the claim that non-banks can evade state-law rate caps by entering into partnerships with National Banks.  As their announcements have already made clear, many non-bank lenders will rely on the Rule to argue they are exempt from otherwise applicable state law.

131.    The State of California also has a sovereign interest in licensing and governing the activities of lenders and other financial entities operating in California in order to protect California consumers.  However, lenders involved in rent-a-bank schemes seek to avoid otherwise applicable state oversight and licensing requirements.[168]  By facilitating such schemes, the Rule will undermine California's licensing regime, which is a fundamental element of the state's lending law.

### 3.    Colorado's Usury Laws and True Lender Litigation

132.    Colorado's civil usury statute has different usury rate limitations on consumer loans for unlicensed and licensed lenders. Unlicensed lenders may not lend at rates above 12% APR. Licensed lenders can lend at the greater of (1) a tiered rate based on the loan amount or (2) a flat 21% rate.[169]

133.    Under the tiered rate, a 36% annual APR applies to the amount financed up to $1,000, a 21% annual APR applies to the amount financed up to $3,000, and a 15% annual APR

---

[167] *See, e.g.*, CRL Comment at 45 & n.137.

[168] State Bank Supervisors Comment at 3-4.

[169] C.R.S. § 5-2-20

applies to any amount financed above $3,000.[170] In effect, the tiered rate is the "greater" rate for smaller dollar loans with the flat 21% rate governing higher dollar loans, including all loans in excess of $9,000.

134.    Colorado actively enforces its usury caps and has recently taken action targeting what it alleged were rent-a-bank schemes. Colorado sued two FinTech lenders for violating C.R.S. § 5-2-201. The non-bank lenders each partnered with a bank to circumvent Colorado's rate caps.  Colorado entered into an Assurance of Discontinuance with the FinTech lenders and their respective bank partners for $1.55 million, and required substantive protections for Colorado consumers modeled after the true lender case law and requirements.   In particular, the terms ensure that the banks retain an adequate economic interest in the loans made under the program, by using one of three alternative program structures to show that the bank is the true lender of the loan. The Assurance of Discontinuance stands in stark contrast with the OCC true lender rule, which is overly simplistic and formulaic, and does not consider the substance of the transaction.

### 4.    The District's Usury Cap and Accompanying Regulations

135.    The District has strict usury caps in order to prevent sophisticated entities from preying upon the District's most vulnerable residents.  The District's usury cap for most loans in which the interest rate is expressed in the contract is 24%.[171]  The District's usury cap for loans without an express interest rate is 6%.[172]

---

[170] C.R.S. § 5-2-201(2)(a).

[171] D.C. Code § 28–3301(a).

[172] *Id.* § 28–3302(a).

136.    Additionally, entities that offer loans in the District at any interest rate are required to obtain a money lending license.[173]

137.    Violations of the usury cap and licensing requirement are enforceable through the Consumer Protection Procedures Act ("CPPA").[174]  The Attorney General for the District of Columbia is specifically authorized to bring actions on behalf of the District against such violators "[n]otwithstanding any provision of law to the contrary."[175]

138.    Indeed, the District has recently filed exactly such an action against an entity that it accuses of abusing this rent-a-bank scheme.[176]  There, the District has accused the Defendant of violating both the District's usury cap and the District's money lending license requirement.

### 5.    Massachusetts' Criminal Usury and Small-Dollar-Loan Laws

139.    Mass. Gen. Law c. 271, § 49 establishes that it is unlawful in Massachusetts to hold a loan contract that requires an interest rate in excess of 20% per year, punishable by imprisonment for up to 10 years and fines of up to $10,000.

140.    Mass. Gen. Law c. 140, §§ 96 through 114A. inclusive, requires persons or entities to be licensed by the Commissioner of Banks if they are engaged, directly or indirectly, in the business of making loans for primarily personal, family or household purposes of $6,000 or less, and the interest and expenses on the loan exceed 12% in the aggregate per year.

---

[173] 16 DCMR § 201.1.

[174] D.C. Code §§ 28–3901, *et seq*.

[175] *Id.* § 28–3909.

[176] *District of Columbia v. Elevate Credit, Inc.*, No. 1:20-cv-01809-EGS (D.D.C. 2020); Press Release, *AG Racine Sues Predatory Online Lender For Illegal High-Interest Loans To District Consumers*, June 5, 2020, https://oag.dc.gov/release/ag-racine-sues-predatory-online-lender-illegal.

141.    Specifically, Mass. Gen. Law c. 140, § 96 states:

> No person shall directly or indirectly engage in the business of making loans of six thousand dollars or less, if the amount to be paid on any such loan for interest and expenses exceeds in the aggregate an amount equivalent to twelve per cent per annum upon the sum loaned . . . The buying or endorsing of notes or the furnishing of guarantee or security for compensation shall be considered to be engaging in the business of making small loans within said sections[.]

142.    Small loans made without proper license are punishable by a fine of up to $10,000 and void under the law.

143.    Specifically, Mass. Gen. Law c. 140, § 110 states, in pertinent part:

> Whoever, not being duly licensed . . . engages in or carries on, directly or indirectly, either separately or in connection with or as a part of any other business, the business of making loans or buying notes or furnishing endorsements or guarantees, to which sections ninety-six to one hundred and eleven, inclusive, apply, shall be punished by imprisonment in the state prison for not more than ten years or in a jail or house of correction for not more than two and one half years, or by a fine of not more than ten thousand dollar, or by both such fine and imprisonment. Any loan made or note purchased or endorsement or guarantee furnished by an unlicensed person in violation of said sections shall be void.

144.    As the chief law-enforcement officer of the Commonwealth, the Attorney General of Massachusetts is authorized to enforce Massachusetts' usury laws by statute and common law.[177]

145.    By purporting to exempt entities that partner with National Banks from Massachusetts' usury laws and the CFA, and by encouraging rent-a-bank schemes, the True Lender Rule undermines Massachusetts' sovereign interests.

---

[177] M.G.L. c. 12, § 10; *see also, e.g.,* M.G.L. c. 93A, § 2.

146.     Since statehood, the Minnesota Legislature has maintained a general usury cap that today generally prohibits the charging and collection of annual interest on written loans above 8% and on non-written loans above 6%.[178]

147.     Minnesota's general usury statute does not apply, however, to certain "financial institutions," such as banks, credit unions, and industrial loan and thrift companies.[179] Other entities may be exempt from the general usury law when operating as a licensed lender under the supervision of the Minnesota Department of Commerce.[180] Many loans issued by state-supervised financial institutions are capped at an "annual percentage rate" of 21.75%.[181] Additional exemptions are set forth throughout Minnesota's banking and finance laws.[182]

148.     As stated above, non-banks that wish to engage in the business of making loans (from $1,000 to $100,000) must obtain a license if they wish to lend above the baseline usury limits set forth in Minnesota's usury statute. The Minnesota Regulated Loan Act provides for examination and supervisory authority of these entities by the Minnesota Department of Commerce, limits fees and interest rates that can be charged by such lenders to that allowed for

---

[178] Minn. Stat. § 334.01, subd. 1.

[179] *Id.* § 334.03; *id.* § 45.59.

[180] *Id.* ch. 56.

[181] *Id.* § 47.59, subd. 3.

[182] *See, e.g.*, *id.* § 47.59, subd. 4 (providing rates and charges for credit sales); *id.* § 47.59, subd. 4a (providing finance charges for motor vehicle retail installment sales); *id.* § 47.60 (allowing certain service charges for short-term, nonrenewal loans).

other state-regulated financial institutions, and prohibits unlicensed lending as a gross misdemeanor.[183]

149.   The Minnesota Legislature has also created an important regulatory scheme for "consumer small loans, "consumer short-term loans," and "motor vehicle title loans." Minnesota Statutes limit fees and interest on these traditionally high-risk credit products while requiring that lenders obtain a license before they extend such credit to Minnesota consumers.[184]

150.   For nonexempt entities that violate Minnesota's usury and lender-licensing laws, Minnesota Statues provide for penalties and remedies that serve important deterrent and remedial interests.[185]  Consumer loans in excess of the usury rate can be declared void and unenforceable, with all amounts paid returned to the borrower.[186]  Loans made by lenders that do not obtain a required license or comply with regulations governing payday and other high-risk consumer lending are void, with all amounts paid returned to borrowers.[187]  Additional civil penalties can also be awarded based on various factors.[188]

---

[183] Minn. Stat. ch. 56.

[184] *Id.* §§ 47.60-.602.

[185] *State by Ellison v. Minn. Sch. of Bus., Inc.*, No. A18-1761, 2019 WL 2333921, at *9 (Minn. App. June 3, 2019) (stating that Minnesota's usury and lender-licensing statutes "are remedial statutes and that consumer protection statutes are generally broadly construed to protect consumers and to remediate violations of those laws"), *review denied* (Aug. 20, 2019).

[186] Minn. Stat. §§ 334.03, 334.05; *Midland Loan Finance Co. v.* Lorentz, 296 N.W. 911, 915 (Minn. 1941) ("As we have here a usurious contract, void under the statute, it follows that the one guilty of usurious exaction must bear the legal consequences flowing from such violation. As such he must lose not only the interest on the money risked, but also the principal, including as well all security given to secure performance.").

[187] Minn. Stat. § 56.19, subd. 3; *id.* § 47.601, subd. 6.

[188] *Id.* § 47.601, subd. 6; *id.* § 8.31, subd. 3; *Minn. Sch. of Bus.*, 2019 WL 2333921, at *7-10.

151.    Like in other jurisdictions, Minnesota courts interpret Minnesota's consumer-lending statutes to apply to entities that engage in "de facto" lending even if they are not identified as the lender on the face of the loan.[189]

152.    The True Lender Rule attempts to generally foreclose application of Minnesota's usury laws to non-banks that engage in rent a bank schemes and preempt Minnesota's "de facto lender" doctrine.  In doing so, the Rule undermines Minnesota's sovereign interests in protecting its consumers from exploitative and abusive interest rates and other illegal-lending practices.

153.    Minnesota also has a sovereign interest in licensing and supervising the activities of lenders operating in Minnesota.  Lenders involved in rent-a-bank schemes and who purchase loans from exempt entities, however, have claimed that they are not subject to state oversight or lender-licensing requirements.  By facilitating such schemes, the Rule will undermine Minnesota's licensing regime, which is a fundamental aspect of state consumer protection law.

### 7.    New Jersey's Usury Laws

154.    New Jersey enforces civil and criminal usury rates.  New Jersey's civil usury rate is set at 6% interest per year, or 16% interest per year where a written contract specifies the interest rate.[190]  The criminal usury rate is set at 30% interest per year for loans to individuals and 50% interest per year for loans to corporations, limited liability corporations, and limited liability partnerships.[191]

---

[189] *See State ex rel. Swanson v. CashCall, Inc.*, No. A13-2086, 2014 WL 4056028, *6 (Minn. Ct. App. Aug. 18, 2014); *c.f. Dunn v. Midland Loan Fin. Corp.*, 289 N.W. 411, 413 (Minn. 1939) (stating that, in applying anti-usury law, Minnesota courts must "look[] through the form to the substance" and that "[n]o device or shift may be employed to conceal the true character of the [loan] transaction").

[190] N.J. Admin. Code § 3:1-1.1(a); N.J. Stat. Ann. § 31:1-1.

[191] N.J. Stat. Ann. § 2C:21-19.

155. New Jersey regulates lenders pursuant to the New Jersey Consumer Finance Licensing Act ("NJCFLA"), among other laws.[192]  Among other things, the NJCFLA confirms that consumer loans subject to its provisions are subject to New Jersey's civil usury rates and/or criminal usury rate, depending on the identity of the lender.[193]  In particular, loans subject to the NJCFLA made by non-licensed lenders are subject to the lower civil usury caps, as well as the criminal usury rates.[194]

156. The True Lender Rule will enable non-banks to evade New Jersey's civil and criminal usury laws by entering into purchase agreements with national banks and will undermine New Jersey's enforcement of its usury laws and its ability to protect consumers through those laws.  Further, by incentivizing New Jersey-licensed lenders to charge interest rates that would otherwise be considered usurious under New Jersey law, the True Lender Rule may undermine New Jersey's comprehensive lender licensing scheme.

### 8. North Carolina Usury and Small-Dollar-Loan Laws

157. The usury laws of North Carolina unequivocally state that protecting North Carolina borrowers from illegal, usurious loans is a "paramount public policy" of the state.[195]

158. North Carolina's usury laws apply to North Carolina residents "regardless of the situs of the contract."[196]  They also cover lenders that make a "solicitation or communication to

---

[192] *Id.* § 17:11C-1 *et seq.*

[193] N.J. Stat. Ann. §§ 17:11C-2, 11C-32(a), 31:1-1; N.J. Admin. Code § 3:1-1.1(a).

[194] N.J. Admin. Code § 3:1-1.1(a); N.J. Stat. Ann. § 31:1-1; *id.* § 2C:21-19.

[195] N.C. Gen. Stat. § 24-2.1(g) ("It is the paramount public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws.").

[196] *Id.* § 24-2.1(a).

lend, oral or written, originating outside of" North Carolina when "forwarded to and received in [North Carolina] by a borrower who is a resident."[197]

159. The maximum interest rate that North Carolina's usury laws allow for contract loans of $25,000 or less is 16% per annum unless another law provides for a higher rate.[198]

160. Under the North Carolina Consumer Finance Act ("CFA"), the maximum interest rate that may be charged by a lender licensed by the North Carolina Commissioner of Banks on personal loans of up to $15,000 ranges between 18% and 30% per annum, depending on the size of the loan, plus a fee of between $25 and $40, charged no more than twice per year.[199]

161. Under the CFA, loans made to North Carolina borrowers are governed by North Carolina law – regardless of any language used in the loan documents – when any aspect of the loan transaction occurs within North Carolina; and any such loans made in violation of North Carolina law are unenforceable.[200] Additionally, the prohibitions found in the CFA "apply to any person who seeks to avoid its application by any device, subterfuge, or pretense whatsoever."[201]

162. Lenders that violate North Carolina's usury laws or the CFA face substantial consequences, including losing the right to collect or retain any interest charges on illegal loans.[202]

---

[197] Id. § 24-2.1(b).

[198] N.C. Gen. Stat. § 24-1.1(a), (c).

[199] Id. § 53-176(a), (b).

[200] Id. § 53-190(a).

[201] Id. § 53-166(b).

[202] Id. §§ 24-2, 53-166(d).

163.     The North Carolina Attorney General, as North Carolina's chief law-enforcement officer, is authorized to enforce North Carolina's usury laws and the CFA pursuant to his independent constitutional, statutory, and common-law authority.[203]

164.     Due to the high interest rates on payday loans, patterns of repeat borrowing, and other potential for abuse, in 2001, North Carolina allowed the authorization for payday lending to sunset, and the state has not subsequently reauthorized any form of payday lending.

165.     After the sunset, most payday lenders closed their doors.  However, others looked for ways to circumvent North Carolina law through, for example, the rent-a-bank model under which the payday lenders claimed that they were not making the loans themselves, but merely the "marketing, processing, and servicing" agents of National Banks and out-of-state state-chartered banks.  The North Carolina Attorney General and the North Carolina Office of the Commissioner of Banks brought numerous enforcement actions against these lenders, which ultimately stopped doing business in the state.

166.     The True Lender Rule will incentivize a return to these attempts by non-bank lenders to evade North Carolina's usury laws and the CFA.  The True Lender Rule will enable rent-a-bank schemes by lending federal support to the claim that non-banks can evade North Carolina's rate caps by entering into purchase agreements with National Banks.  Many non-bank lenders will rely on the True Lender Rule to attempt to shield them from otherwise applicable state law.

---

[203] *See, e.g.*, N.C. Gen. Stat. §§ 75-14, -15.1, -15.2 (authorizing the North Carolina Attorney General to obtain various forms of monetary and injunctive relief against entities that engage in "unfair or deceptive acts or practices in or affecting commerce").

167.     The State of North Carolina also has a sovereign interest in licensing and governing the activities of lenders and other financial entities operating in North Carolina in order to protect North Carolina consumers.  However, lenders involved in rent-a-bank schemes have claimed that they are not subject to oversight and licensing by the North Carolina Commissioner of Banks as required by the CFA.[204]  By facilitating such schemes, the True Lender Rule will undermine North Carolina's licensing regime provided by the CFA, which is a fundamental element of the state's lending laws.

168.     By purporting to exempt entities that partner with National Banks from North Carolina's usury laws and the CFA, and by encouraging rent-a-bank schemes, the True Lender Rule undermines North Carolina's sovereign interests.

*    *    *    *    *

169.     The True Lender Rule would harm the States' sovereign interests in enforcing their laws by facilitating rent-a-bank schemes and shielding those schemes from state scrutiny. The True Lender Rule would permit non-bank entities to violate state usury caps provided the non-bank entity enters into a partnership with a National Bank[205]

170.     By enacting Section 25b of the Dodd-Frank Act, Congress has demonstrated its intent that states may vindicate their interests.  As described above, the Dodd-Frank Act contains a number of substantive and procedural hurdles the OCC must clear before preempting "state consumer financial laws."[206]  Among other things, the OCC must consider, on a "case-by-case

---

[204] *See, e.g.*, *Lingerfelt*, 211 F. Supp. 2d at 714; *In re Advance Am.*, No. 05:008:CF (N.C. Comm'r of Banks Dec. 22, 2005).

[205] *E.g.*, Cal. Fin. Code §§ 22303, 22304, 22304.5.

[206] 12 U.S.C. § 25b.

basis," the effect each state law facing preemption has on national banks and must adduce "substantial evidence" supporting any preemption determination.[207]  States are the primary beneficiaries of these provisions, demonstrating that protection of their sovereign and quasi-sovereign interests was among Congress's statutory objectives.[208]

### B. Quasi-Sovereign Interests

171.    The True Lender Rule also harms the States' quasi-sovereign interests in promoting a fair lending marketplace that ensures borrowers in the States are not overburdened by exploitative interest rates, that law-abiding lenders in the States are not undercut by competitors who operate in the States but evade their laws, that other creditors (like landlords, suppliers, and mortgage or auto lenders) in the States are not faced with non-payment if their debtors take on high-interest loans and become insolvent, and that taxpayers are not left with the tab for costs the States incur when consumers trapped in a cycle of debt are unable to provide for their basic needs and require assistance from the States to do so.

172.    States have historically exercised significant regulatory and enforcement authority in the area of consumer protection.  Each State "has a quasi-sovereign interest in the health and well-being – both physical and economic – of its residents in general."[209]  And courts have repeatedly held that a state's interest in protecting consumers within its borders is itself quasi-

---

[207] 12 U.S.C. § 25b(b), (c).

[208] Sections 85 and 1463(g)(1) themselves likewise demonstrate Congress's concern for states' interest in preserving their power to regulate entities within their jurisdictions.  Both sections explicitly preempt state law *only* with respect to federally chartered entities.  States benefit from Congress's deliberate choice to displace state law only with respect to the banks the federal government directly charters and supervises.

[209] *Alfred L. Snapp & Son*, 458 U.S. at 607; *also, e.g.*, *Missouri v. Illinois*, 180 U.S. 208, 241 (1901) ("[I]f the health and comfort of the inhabitants of a state are threatened, the state is the proper party to represent and defend them.").

sovereign in nature.[210]  Moreover, Congress and the courts have been reluctant to interfere with

the states' authority to enforce their consumer-protection laws:  The Supreme Court has held that

the NBA only preempts state consumer-protection laws when the state law would "prevent or

significantly interfere with the national bank's exercise of its powers,"[211] and Congress has

ordered the OCC to follow this same standard.[212]

173.    The True Lender Rule harms the States' quasi-sovereign interests by injuring

borrowers in the States: as those consumers pay interest not permissible under state law, they

will face an increased risk of falling into a vicious and destructive cycle of continuously taking

out new high-interest, short-term loans to cover prior ones.

174.    The True Lender Rule also harms the States' quasi-sovereign interests by

imposing costs on taxpayers in the States who have not taken out usurious loans.  Consumers

trapped in a cycle of debt are often unable to provide for their basic needs and may need public

assistance.[213]  Studies have shown, for example, that consumers who take out short-term, high-

interest loans are more likely to end up requiring food assistance and less likely to remain current

---

[210] *See, e.g.*, *New York v. Citibank, N.A.*, 537 F. Supp. 1192, 1197 (S.D.N.Y 1982) ("The state has a quasi-sovereign interest in protecting the welfare of its citizens . . . and that interest includes protection of its citizens from fraudulent and deceptive practices.").

[211] *Barnett Bank of Marion Cty., N.A. v. Nelson*, 517 U.S. 25, 33 (1996).

[212] 12 U.S.C. § 25b(b)(1).

[213] *See, e.g.*, Anne Fleming, *The Public Interest in the Private Law of the Poor*, 14 Harv. L. & Pol'y Rev. 159, 178-79 (2019), *available at* https://harvardlpr.com/wp-content/uploads/sites/20/2020/03/Fleming.pdf.

on child support.[214]  The costs of providing these services are ultimately borne by taxpayers in the form of higher tax bills.

175.    The True Lender Rule will also injure lenders in the States that comply with state law.  Non-bank lenders that comply with the Plaintiff States' laws will be at a competitive disadvantage to lenders in rent-a-bank partnerships that, according to the True Lender Rule, are not subject to state rate caps.

176.    The States' quasi-sovereign interests are separate and distinct from the interests of individual borrowers and lenders.  Lending occurs in a marketplace that the States and federal law jointly facilitate.  The States have a quasi-sovereign interest in ensuring that their lending marketplace is fair, is competitive, and supports each State's economy.

### C.    Fiscal Interests

177.    The True Lender Rule also causes direct harm to the States because it will injure the States' fiscal interests through the loss of licensing fees and by increasing the cost and difficulty of enforcing the States' laws.  The States' laws, as discussed above, provide a comprehensive regime for licensing, regulating, and supervising the activities of non-bank lenders operating in the States.  Each of the States – through its primary financial regulator or Attorney General, as the state's chief law-enforcement officer – allocates substantial resources to maintaining compliance with their state lending laws.

178.    Even before the OCC issued the True Lender Rule, lenders involved in rent-a-bank schemes have claimed that they are not subject to state licensing or oversight.  By

---

[214] *See* Brian T. Melzer, *Spillovers from Costly Credit* 4-6 (U.S. Census Bureau Ctr. for Econ. Stud., Working Paper No. CES-WP-11, Dec. 2016), *available at* https://brianmelzer.com/wp-content/uploads/2016/12/Spillovers_final_wp.pdf.

facilitating these schemes, the True Lender Rule will foreseeably decrease licensing fees received by the States and increase the cost and burden of future supervisory, investigative, and law-enforcement efforts by the States.

179.     The True Lender Rule will also injure the States' fiscal interests because the States will be required to provide financial assistance to consumers who fall into a cycle of debt and are unable to provide for their basic needs.[215]  The States will also have to devote money and other resources to assisting these consumers who, as a result of predatory loans, may no longer be able to afford basic necessities such as food, shelter, and medical treatment.

## Claims

## I.     Administrative Procedure Act (In Excess of Statutory Jurisdiction, Authority, or Limitations, or Short of Statutory Right)

180.     The States repeat and reallege paragraphs 1-179 as if fully set forth herein.

181.     Under the APA, a reviewing court shall "hold unlawful and set aside agency action" that is found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."[216]

182.     As described in detail above, the True Lender Rule:

> a)  is contrary to the plain statutory language of the three federal statutes that it purports to interpret;
>
> b)  ignores elements of the statutory scheme contrary to the OCC's interpretation;
>
> c)  is contrary to the express will of Congress and the presumption against preemption;
>
> d)  exceeds the OCC's statutory authority; and

---

[215] *See id.*

[216] 5 U.S.C. § 706(2)(C).

<blockquote>e) conflicts with the OCC's own longstanding policies and practices.</blockquote>

183. The True Lender Rule is in excess of statutory jurisdiction, authority, and limitations, and short of statutory right, and the Court should set it aside under the APA.

## II. Administrative Procedure Act (Arbitrary, Capricious, An Abuse of Discretion, or Otherwise Not In Accordance with Law)

184. The States repeat and reallege paragraphs 1-183 as if fully set forth herein.

185. Under the APA, a reviewing court shall "hold unlawful and set aside agency action" that is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." [217]

186. As described in detail above, the True Lender Rule:

> a) is contrary to the plain statutory language of the three federal statutes that it purports to interpret;
>
> b) is an unreasonable interpretation of federal law;
>
> c) ignores elements of the statutory scheme contrary to the OCC's interpretation;
>
> d) is contrary to the express will of Congress and the presumption against preemption;
>
> e) exceeds the OCC's statutory authority;
>
> f) entirely fails to consider important aspects of the rent-a-bank problem;
>
> g) offers an explanation for the OCC's decision that runs counter to the evidence before the agency; and
>
> h) conflicts with the OCC's own longstanding policies and practices.

---

[217] 5 U.S.C. § 706(2)(A).

187.     The True Lender Rule is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law and should be declared unlawful and set aside under the APA.

## III.     Administrative Procedure Act (Action Taken Without Observance of Procedure Required by Law)

188.     The States repeat and reallege paragraphs 1-187 as if fully set forth herein.

189.     Under the APA, a reviewing court shall "hold unlawful and set aside agency action" that is found to be taken "without observance of procedure required by law."[218]

190.     In promulgating the True Lender Rule the OCC failed to abide by the requirements imposed by Section 25b of the Dodd-Frank Act.

191.     The True Lender Rule is thus action taken without procedure required by law and should be declared unlawful and set aside under the APA.

---

[218] 5 U.S.C. § 706(2)(D).

## Prayer for Relief

WHEREFORE, the States respectfully request that the Court enter a judgment in their

favor and grant the following relief:

a) declare that the OCC violated the APA because its True Lender Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

b) declare that the OCC violated the APA because its True Lender Rule is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

c) declare that the OCC violated the APA because its True Lender Rule constitutes agency action taken without procedure required by law;

d) hold unlawful and set aside the True Lender Rule;

e) award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

f) grant such other relief as the Court deems just and proper.

Dated:   New York, New York
         January 5, 2021

LETITIA JAMES
Attorney General of the State of New York


By:__/s/ Christopher L. McCall_____
Jane M. Azia, Bureau Chief
Laura Levine, Deputy Bureau Chief
Christopher L. McCall, Assistant Attorney General
Office of the New York Attorney General
Bureau of Consumer Frauds and Protection
28 Liberty Street, 20th Floor
New York, New York  10005
Telephone:  (212) 416-8303
Email:  christopher.mccall@ag.ny.gov

*Attorneys for Plaintiff the People of the State of New York*

XAVIER BECERRA
Attorney General of California


By: _/s/ Christopher Lapinig_____
Nicklas A. Akers, Senior Assistant Attorney General
Christopher Lapinig, Deputy Attorney General
Office of Attorney General
Consumer Protection Section
300 S. Spring St. #1700
Los Angeles, California  90013
Telephone:  (213) 269-6697
Email:  christopher.lapinig@doj.ca.gov

*Attorneys for Plaintiff the People of the*
*State of California*

PHILLIP J. WEISER
Attorney General of the State of Colorado


By: __/s/ Nikolai Frant_____
Nikolai Frant, First Assistant Attorney General (*pro hac*
*vice* application forthcoming)
Colorado Office of the Attorney General
1300 Broadway, 7th Floor
Denver, Colorado  80203
Telephone:  (720) 508-6000
Email:  Nikolai.Frant@coag.gov

*Attorneys for Plaintiff the State of Colorado*

KARL A. RACINE
Attorney General of the District of Columbia


By:___/s/ David Brunfeld_____
David Brunfeld, Assistant Attorney General & Charles
F. C. Ruff Fellow (*pro hac vice* application
forthcoming)
District of Columbia Office of the Attorney General
Public Advocacy Division
400 6th Street N.W., 10th Floor
Washington, D.C.  20001
Telephone:  (202) 724-5079
Email:  David.brunfeld@dc.gov

*Attorneys for Plaintiff the District of Columbia*

MAURA HEALEY
Attorney General of the
Commonwealth of Massachusetts

By:___/s/ Brendan T. Jarboe_____
Brendan T. Jarboe, Assistant Attorney General (*pro hac
vice* application forthcoming)

Office of Attorney General Maura Healey
Consumer Protection Division
One Ashburton Place
Boston, Massachusetts  02108
Telephone:  (617) 727-2200
Email:  brendan.jarboe@mass.gov

*Attorneys for Plaintiff the
Commonwealth of Massachusetts*

KEITH ELLISON
Attorney General of Minnesota

By: _/s/ Adam Welle_____
Adam Welle, Assistant Attorney General (*pro hac vice*
application forthcoming)

Minnesota Attorney General's Office
Bremer Tower, Suite 1200
445 Minnesota Street
St. Paul, Minnesota 55101
Telephone: (651) 757-1425
Email: adam.welle@ag.state.mn.us

*Attorneys for Plaintiff the State of Minnesota*

GURBIR S. GREWAL
Attorney General of New Jersey

By: _/s/ Mayur P. Saxena_____
Mayur P. Saxena, Assistant Attorney General
Tim Sheehan, Deputy Attorney General
124 Halsey Street, 5th Floor
Newark, New Jersey 07101
P.O. Box 45029-5029
Telephone: (973) 648-3283
Fax: (973) 648-4887
Email: Mayur.Saxena@law.njoag.gov

*Attorneys for Plaintiff the State of New Jersey*

JOSHUA H. STEIN
Attorney General of North Carolina


By: __/s/ Daniel P. Mosteller_____
Kevin Anderson, Division Director
Daniel P. Mosteller, Special Deputy Attorney General
(*pro hac vice* application forthcoming)
M. Lynne Weaver, Special Deputy Attorney General
North Carolina Attorney General Office
Consumer Protection Division
114 W. Edenton Street
P.O. Box 629
Raleigh, North Carolina  27602
Telephone: (919) 716-6000
Email:  dmosteller@ncdoj.gov

*Attorneys for Plaintiff the State of North Carolina*